**Richard COTTO, Petitioner–Appellant,**

v.

**Victor HERBERT, Warden, Attica Correctional Facility, Respondent–Appellee.**

**Docket No. 01–2694.**

United States Court of Appeals, Second Circuit.

Argued: Oct. 10, 2002.

Supplemental Briefs Filed: Nov. 22, 2002.

Decided: May 1, 2003.

Jonathan I. Edelstein, Kew Gardens, N.Y. (Abraham Abramovsky, Fordham University School of Law, New York, NY, on the brief), for Petitioner–Appellant.

Donna Krone, Assistant District Attorney, New York County (Robert M. Morgenthau, District Attorney for New York County, Morrie I. Kleinbart, Assistant District Attorney, on the brief), New York, NY, for Respondent–Appellee.

Before: OAKES, STRAUB, Circuit Judges, and PRESKA, District Judge.*

STRAUB, Circuit Judge.

Shortly before 8:00 p.m. on November 28, 1992, at the corner of East 103rd Street and Second Avenue in Manhattan, Steven Davilla was shot. He died at the hospital four hours later. After approximately a year, petitioner-appellant Richard Cotto was arrested and charged with Davilla's murder. In the months before Cotto's trial began in March 1996, Anthony Echevarria, a neighborhood resident who knew both Cotto and Davilla, told law en-

* The Honorable Loretta A. Preska, Judge of the United States District Court for the Southern District of New York, sitting by designation.

forcement officers that he saw Cotto shoot Davilla. When interviewed by detectives shortly after the shooting, Echevarria had given a false name and stated, both orally and in writing, that he could not identify the shooter.

A few days before trial, the lead prosecutor informed the defense that Echevarria would be called as an eyewitness, scheduled to testify on Monday, March 18th. However, Echevarria called the prosecutor on Sunday, March 17th, stating that he feared for the safety of his family, and would not identify Cotto as the shooter if called upon to testify. The prosecutor called Echevarria to the stand anyway, and indeed Echevarria testified on direct examination that he did not see the shooter. After a *Sirois* hearing, held outside the presence of the jury, in which the prosecution set forth evidence that Cotto had intimidated Echevarria into changing his story, the police officers were permitted to testify about Echevarria's statements inculpating Cotto the week before, and Cotto was convicted. Echevarria was the only eyewitness to the shooting to testify at trial.

In his summation, the prosecutor described Echevarria's taking of the stand, and, seeking to explain the discrepancies between Echevarria's in-court testimony and prior out-of-court statements, said: "The defendant is here, he is confronted by the defendant." Although the prosecutor used the term "confronted" in the physical sense, the question presented by this case is whether Cotto was able to confront Echevarria in the constitutional sense, as guaranteed by the Sixth Amendment.

Due to the number of issues involved in this case, we set out the following table of contents:

## CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .225

 I. The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .225
 A. The *Sirois* Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .226
 B. Remainder of Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .227

 II. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .227

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .229

 I. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .229
 A. Confrontation Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .229
 B. § 2254 Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .229

 II. The Admission of Echevarria's Out of Court Statements . . . . . . . . . . . . . . . . . . . . .231
 A. Was the determination that Cotto "procured" Echevarria's unavailability an "unreasonable determination of the facts in light of the evidence presented"? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .232
 B. Was the determination that Cotto forfeited his Confrontation Clause and hearsay objections to the out-of-court statements an "unreasonable application" of clearly established Supreme Court law? . . . . . . . . . . . . .233
 C. Did the statements bear sufficient "indicia of reliability"? . . . . . . . . . . . . . . . .235

 III. The Preclusion of Cross–Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .236
 A. Procedural Bar . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .236
 1. Scope of Certificate of Appealability . . . . . . . . . . . . . . . . . . . . . . . . . . . . .236
 2. Exhaustion Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .237
 3. Independent and Adequate State Grounds . . . . . . . . . . . . . . . . . . . . . . . . .238

a. Standard for Adequacy ........................................239
b. The Circumstances of the Ruling Precluding Cross–
 Examination in this Case....................................241
c. Application of the *Lee* Factors ...............................242
B. The Merits ........................................................247
 1. The "Unreasonable Application" Standard ..........................247
 2. Clearly Established Supreme Court Law on Cross–Examination .......248
 3. Clearly Established Supreme Court Law on Waiver of Cross–
 Examination Through Misconduct................................249
 4. Objective Unreasonableness......................................251
 5. Harmless Error .................................................253
 a. Standard of Review .........................................253
 b. Application of *Van Arsdall* Factors .........................254

IV. Conclusion .......................................................258

## BACKGROUND

Cotto appeals from an October 5, 2001 judgment of the United States District Court for the Southern District of New York (Alvin K. Hellerstein, *Judge*) denying his application for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, in connection with his April 16, 1996 conviction in the Supreme Court for New York County, following a jury trial, for Murder in the Second Degree, Criminal Use of a Firearm in the First Degree, and Criminal Possession of a Weapon in the Third Degree. Cotto was sentenced to concurrent prison terms totaling 25 years to life, and is now in state prison pursuant to that conviction.

### I. The Trial

Cotto's trial began on March 15, 1996. After police witnesses testified to the shooting of Davilla, the crime scene investigation and the arrest of Cotto, Echevarria was called as a witness for the prosecution. Echevarria testified that on the evening of November 28, 1992, he was with Davilla on the corner of 103rd Street and Second Avenue, talking, drinking beer and smoking marijuana. While using a payphone, he saw two people across the street in a park, one of whom ran across the street to the sidewalk on Echevarria's side. He then heard someone behind him say "What's up now, money?" and started

hearing shots. He testified that he did not see the shooter "[b]ecause once the shots started that was it, I ain't looking at nobody." At that point in the direct testimony, due to the apparent inconsistency between Echevarria's trial testimony and his pretrial statements to law enforcement, the prosecutor asked Echevarria if he recalled his prior conversations with him, and defense counsel objected. The jury was then excused, and Echevarria told the court that he had to "think of [his] family."

During the ensuing colloquy, the prosecution maintained that Echevarria had told them earlier that "some men had approached members of his family" and "gave him reason to believe that there was a contract out on them." In addition, the government alleged, without providing details, that Echevarria's fiancée had expressed fear for herself and her child and that "someone" had approached his mother and sister and inquired into his whereabouts.

At this point, the trial court suggested to the prosecutors that they move for a *Sirois* hearing—a hearing held in New York criminal cases to determine whether the defendant has procured a witness's absence or unavailability through his own misconduct, and thereby forfeited any hearsay or Confrontation Clause objec-

tions to admitting the witness's out-of-court statements. *See People v. Geraci,* 85 N.Y.2d 359, 625 N.Y.S.2d 469, 649 N.E.2d 817 (1995).[1] The prosecution agreed and moved for such a hearing. Their motion was granted, and the hearing was held later that week, outside the presence of the jury.

### A. The Sirois Hearing[2]

At the *Sirois* hearing, the prosecution called Police Officer Wilson Vargas and Detective Hedxan Quinones, who had been present at the March 13 and 14 trial preparation sessions with Echevarria. In each of the sessions, according to these witnesses, Echevarria described the events he saw the night of the shooting, relating that while he was using a telephone on the corner, he saw the defendant cross the street in a crouched manner, holding his hand close to his side. When he reached the corner, the defendant approached Davilla, said "What's up now, money?" while pointing a gun at Davilla, and shot him. Davilla fell backward, stumbled and attempted to run away. Cotto followed, continuing to fire shots, then turned around, looked at Echevarria face-to-face, pointed the gun at him without firing, and fled. Vargas and Quinones further testified that during the two sessions, Echevarria was seated in a chair, was not in handcuffs, did not appear nervous, demonstrated a positive frame of mind, engaged in conversation without any sign of discomfort, and was not promised anything for his trial testimony.

Officer Vargas testified additionally that he and a prosecutor met with Echevarria again on March 20th, two days after Eche-

varria testified that he could not identify the shooter. At the meeting, Echevarria indicated that he was afraid "something might happen to [his] family" if he testified and that "there would probably be a contract" out on him. In addition, the government introduced the audiotape recording of the two messages left by Echevarria on the lead prosecutor's voicemail on March 17, expressing concern about testifying.

Detective Quinones further testified that he had spoken with Echevarria's mother and sister before the *Sirois* hearing. Echevarria's sister told Quinones that a few days earlier, unidentified people from her neighborhood had approached her and asked her exactly where Echevarria was being housed in Riker's Island. She told the detective that the "word out on the street" was that her brother "was talking." She added that she knew that Cotto's family had "killed a family a while ago" and that if anyone talked against his family, he or she would be killed.

The prosecution also called Echevarria's mother as a hearing witness. She testified that her daughter told her that someone had stopped her in the street and had asked whether her brother was incarcerated. Echevarria's mother testified that her daughter said she was scared and afraid for her brother—a sentiment she had never previously expressed.

When called by the prosecution at the *Sirois* hearing, both Echevarria and his sister denied making these statements. Echevarria's sister denied that she had been harassed, and denied telling Detective Quinones or her mother about a con-

---

1. This procedure is analogous to the *Mastrangelo* hearing used in federal cases in the Second Circuit. *See United States v. Mastrangelo,* 693 F.2d 269, 272 (2d Cir.1982).

2. This summary of the hearing testimony is taken largely from the New York Court of Appeals' opinion, as well as an independent review of the record. *People v. Cotto,* 92 N.Y.2d 68, 73–75, 677 N.Y.S.2d 35, 699 N.E.2d 394, 396–97 (1998).

versation with the harassing party. Echevarria himself reiterated his trial testimony that he could not identify the shooter, and explained his voicemail message by stating that he did not want to testify at trial because he did not want to miss an upstate parole hearing.

At the conclusion of the *Sirois* hearing, the trial court decided, in an oral ruling that was followed by a written opinion, *People v. Cotto*, 642 N.Y.S.2d 790, 169 Misc.2d 194 (N.Y.Sup.Ct.1996), that Cotto had procured Echevarria's unwillingness to testify, and therefore his statements to the prosecutor and police officers from the week before trial would be admissible as evidence of Cotto's guilt. In addition, the trial court ruled that the defense would be precluded from cross-examining Echevarria, concluding that "no truth-serving function would be served" by allowing him to be cross-examined on any subject.

### B. *Remainder of Trial*

After the *Sirois* hearing, the jury returned to the courtroom, and the two police officers who met with Echevarria during his trial preparation sessions testified that Echevarria had identified Cotto as the shooter during those sessions. One of the officers also indicated that when the prosecutor asked Echevarria why he had not previously identified Cotto as the shooter in his statements to the police shortly after Davilla's shooting in 1992, and Echevarria replied that he was scared to do so. Another police officer testified that in the ambulance after the shooting, Davilla had identified Cotto as the shooter. The police officer's testimony was corroborated by the emergency medical technician in the ambulance, who also heard Davilla identify someone named "Richie" as the shooter.

Kenny Cobb, another civilian witness to testify at trial, testified that he had also been with Davilla, Echevarria and other people on the corner that evening, heard the shots, jumped inside a building, and came back out when the shots had stopped. Cobb saw someone running from the park who he could not describe, asked Echevarria what was going on and Echevarria told him "they were shooting." Cobb testified that he left the scene immediately afterwards because he had drugs in his pocket. In his testimony, he did not identify the shooter, or say that Echevarria told him who the shooter was. The defense did not call any witnesses.

At the conclusion of trial, the jury convicted Cotto of all the charges. On August 22, 1996, the trial court sentenced Cotto to an indeterminate prison term of 25 years to life.

## II. Procedural History

On direct appeal to the Appellate Division, First Department, Cotto argued that his confrontation rights were violated by: (1) the trial court's finding that he had procured Echevarria's unavailability through misconduct, and the resulting admission of Echevarria's out-of-court statements; (2) the trial court's preclusion of all cross-examination of Echevarria; and (3) the admission of Davilla's statement in the ambulance, identifying Cotto as his shooter, as an excited utterance.[3] On June 5, 1997, the Appellate Division affirmed Cotto's conviction, concluding that the trial court's *Sirois* ruling was supported by sufficient evidence, and that Davilla's statement was properly admitted as an excited utterance. The Appellate Division also ruled that the complete preclusion of

---

**3.** Cotto made several other arguments on direct appeal which are not relevant to our disposition of this case.

cross-examination of Echevarria was proper, finding in the alternative that the issue was unpreserved. *See People v. Cotto*, 240 A.D.2d 193, 658 N.Y.S.2d 278 (1st Dep't 1997).

Cotto then applied for and obtained leave to appeal to the New York Court of Appeals. Before the Court of Appeals, Cotto raised essentially the same claims as he had in the Appellate Division. On July 1, 1998, the Court of Appeals affirmed Cotto's conviction in a 5–2 decision. *People v. Cotto*, 92 N.Y.2d 68, 73–75, 677 N.Y.S.2d 35, 699 N.E.2d 394, 396–97 (1998). The majority agreed with the Appellate Division's conclusions that the trial court's *Sirois* ruling was supported by sufficient evidence, and that Davilla's statement was properly admitted as an excited utterance. In addition, the majority agreed that the preclusion of cross-examination claim was unpreserved, declining to address the merits of this claim. The dissent rejected all of these conclusions, arguing that the admission of Echevarria's out-of-court statements as well as the complete preclusion of cross-examination violated Cotto's confrontation right, and that Davilla's statement did not have sufficient "indicia of reliability" to be admissible. *See id.* at 80–92, 677 N.Y.S.2d 35, 699 N.E.2d 394 (Smith, J., dissenting).

On March 11, 1999, Cotto filed a petition for post-conviction relief in the trial court. In his petition, Cotto alleged that his trial counsel was ineffective for failing to make a number of objections, including an objection to the trial court's complete preclusion of cross-examination against Echevarria. In a decision and order dated May 25, 1999, the trial court denied Cotto's petition in its entirety. Cotto applied for leave to appeal this decision to the Appellate Division, First Department, but this application was denied on August 12, 1999. On January 5, 2000, Cotto filed a motion for a writ of error *coram nobis* in the Appellate Division, First Department, claiming ineffective assistance of appellate counsel, which was denied on September 21, 2000.

On November 13, 2000, Cotto filed a habeas petition, pursuant to 28 U.S.C. § 2254, in the Southern District of New York. In this petition, Cotto raised five claims: (1) the admission of Echevarria's out-of-court statements, based on the trial court's ruling after the *Sirois* hearing, violated his Confrontation Clause right; (2) the complete preclusion of cross-examination of Echevarria also violated his Confrontation Clause right; (3) the admission of Davilla's statement as an excited utterance was improper, and also violated the Confrontation Clause; (4) he received ineffective assistance of trial counsel; and (5) he received ineffective assistance of appellate counsel.

On October 4, 2001, the District Court denied Cotto's petition in an oral ruling. The District Court concluded that all grounds for relief had been fairly presented to the New York courts, but that petitioner had procedurally defaulted his claim regarding the complete preclusion of cross-examination of Echevarria by failing to make a sufficiently specific objection at trial. The District Court ruled against petitioner on his ineffective assistance claims and concluded that the state courts' *Sirois* rulings, as well as the ruling on the admission of Davilla's statement, were not unreasonable applications of clearly established Supreme Court law. The District Court granted a certificate of appealability on two claims: "(1) Whether the ruling of the New York Supreme Court, admitting into evidence witness Anthony Echevarria's out-of-court identification of Petitioner, violated Petitioner's Sixth Amendment rights"; and (2) "Whether said ruling, precluding cross-examination of Echevarria

by defense counsel, violated Petitioner's Sixth Amendment rights."

## DISCUSSION

### I. Legal Standards

#### A. *Confrontation Clause*

■ The fundamental constitutional right in this case is established by the Confrontation Clause of the Sixth Amendment which provides "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him ...." U.S. Const. amend. VI. The primary purpose of this guarantee is to secure for the defendant the opportunity of cross-examination. *See Davis v. Alaska,* 415 U.S. 308, 315–16, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974). Because "[c]ross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested," *id.* at 316, 94 S.Ct. 1105, "[t]he opportunity for cross-examination, protected by the Confrontation Clause, is critical for ensuring the integrity of the fact-finding process." *Kentucky v. Stincer,* 482 U.S. 730, 736, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). Thus, there is a strong presumption that any testifying witness should be subject to cross-examination, and that out-of-court statements should not be used against a criminal defendant in lieu of in-court testimony subject to the scrutiny of cross-examination. As the Supreme Court explained in *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1985), "[t]here are few subjects, perhaps, upon which this Court and other courts have been more nearly unanimous than in their expressions of belief that the right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal."

■ Confrontation Clause claims generally fall into "two broad, albeit not exclusive, categories: 'cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination.'" *Stincer,* 482 U.S. at 737, 107 S.Ct. 2658 (quoting *Delaware v. Fensterer,* 474 U.S. 15, 18, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985) (per curiam)). Petitioner brings both types of claims in this case.

#### B. *§ 2254 Analysis*

■ This court reviews a district court's denial of a writ of habeas corpus *de novo. See Loliscio v. Goord,* 263 F.3d 178, 184 (2d Cir.2001). Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified in 28 U.S.C. § 2254(d), the standard governing federal habeas review depends on whether petitioner's claim has been previously "adjudicated on the merits" by a state court.[4] The statute reads:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Feder-

---

4. Although some commentators have noted that § 2254(d) is more accurately described as a "limitation on relief" rather than a "standard of review," James S. Liebman & Randy Hertz, 2 Federal Habeas Corpus Practice and Procedure § 30.2a, at 1357 (4th ed. 2001) (quoting the statement in *Williams v. Taylor,* 529 U.S. 362, 412, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000), that § 2254(d) acts as a "constraint on the power of a federal habeas court to grant ... the writ"), we have continued to use the "standard of review" formulation after *Williams,* and we do so again here.

al law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

■■■ As we have previously stated, "[t]he necessary predicate to this deferential review is, of course, that petitioner's federal claim has been 'adjudicated on the merits' by the state court. If a state court has not adjudicated the claim 'on the merits,' we apply the pre-AEDPA standards, and review *de novo* the state court disposition of the petitioner's federal constitutional claims." *Aparicio v. Artuz*, 269 F.3d 78, 93 (2d Cir.2001). We have further held that "[a] state court 'adjudicates' a petitioner's federal constitutional claims 'on the merits' when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment.'" *Norde v. Keane*, 294 F.3d 401, 410 (2d Cir.2002) (quoting *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir.2001)). To determine whether a state court has disposed of a claim on the merits, we consider: "(1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits." *Aparicio*, 269 F.3d at 93 (quoting *Sellan*, 261 F.3d at 314).

■■■ There is no dispute that the first issue certified for appeal was "adjudicated on the merits" in the state courts. The Court of Appeals held that Echevarria's out-of-court statements were properly ad-mitted because the government had met its burden of proving that Cotto had intimidated Echevarria, thus procuring his "unavailability" at trial. *See Cotto*, 92 N.Y.2d at 76–77, 677 N.Y.S.2d 35, 699 N.E.2d 394. We therefore analyze this issue under the deferential AEDPA standard of review.

It is less clear whether there was an "adjudicat[ion] on the merits in State court proceedings" as to the second issue certified for appeal—the preclusion of cross-examination claim. 28 U.S.C. § 2254(d). Respondent argues that there was no adjudication on the merits because the Court of Appeals deemed the claim unpreserved, and therefore habeas review is unavailable, while Cotto argues in his brief that the trial court's ruling was such an adjudication.[5]

First, respondent's claim that habeas review is unavailable in the absence of an adjudication on the merits has no basis in law or logic. If there is no adjudication on the merits, then the pre-AEDPA, *de novo* standard of review applies. *See Eze v. Senkowski*, 321 F.3d 110, 120 (2d Cir. 2003).

The question is whether the rulings of either the trial court or the Appellate Division constituted an "adjudication on the merits." Certainly, the trial court's ruling was, implicitly or explicitly, a determination that precluding Cotto from cross-examining Echevarria did not violate his Sixth Amendment right to confrontation because of his misconduct, and the ruling was not on a procedural ground. *Cf. Channer v. Brooks*, 320 F.3d 188, 195 (2d Cir.2003) (according deference under § 2254(d) to trial court's determination

---

**5.** In the District Court, petitioner had taken the position that there was no "adjudicat[ion] on the merits," and therefore the pre-AEDPA, *de novo* standard of review should apply.

Adding to the confusion, both parties agreed at oral argument that there had been no adjudication on the merits.

that "the trial outcome was fair"). Although neither party raises the possibility, the Appellate Division decision may also constitute an "adjudication of the merits" of the cross-examination issue. The Appellate Division ruled that "the court's ruling barring cross-examination of the witness was appropriate under the circumstances presented since the witness's testimony was at complete variance with his prior statement to the People." *Cotto*, 658 N.Y.S.2d at 279. Alternatively, the Appellate Division ruled "[i]n any event, we find the issue unpreserved." *Id.* If Cotto had been denied leave to appeal to the Court of Appeals, the Appellate Division's ruling would certainly have been an "adjudication on the merits" under § 2254(d). *See Sellan*, 261 F.3d at 311 ("'Adjudicated on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other ground.").

The Court of Appeals, however, did review Cotto's case, and adopted the holding that the issue was unpreserved, *see Cotto*, 92 N.Y.2d at 78, 677 N.Y.S.2d 35, 699 N.E.2d 394, arguably eliminating the force of the Appellate Division's ruling on the merits. *See Liegakos v. Cooke*, 106 F.3d 1381, 1385 (7th Cir.1997) ("Although the state's trial court rejected on the merits the arguments that [petitioner] presented for the first time on collateral attack, the court of appeals relied entirely on [procedural grounds], and the disposition of the last state court to issue an opinion determines whether the state has invoked a ground of forfeiture."); *cf. Ylst v. Nunnemaker*, 501 U.S. 797, 801, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (explaining that "if

the last state court to be presented with a particular federal claim reaches the merits," any procedural bar is removed).

We are inclined to conclude that the Court of Appeals' holding that the preclusion of cross-examination claim was unpreserved means that the claim was not "adjudicated on the merits" in the state courts. However, because the Appellate Division's ruling that such preclusion was proper, as well as said ruling by the trial court, indicates "merits" consideration, we will assume without deciding that there was an "adjudication on the merits" in the state courts, and first analyze whether habeas relief is warranted under the deferential § 2254(d) standard.

## II. The Admission of Echevarria's Out of Court Statements

■ Although the Sixth Amendment generally bars the admission of out-of-court statements without an opportunity for cross-examination, *see Douglas v. Alabama*, 380 U.S. 415, 418–19, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965), the Supreme Court has also recognized that in limited circumstances, a defendant's intentional misconduct can constitute a waiver of his Confrontation Clause right.[6] *See, e.g., Illinois v. Allen*, 397 U.S. 337, 343, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970) (defendant waives his right to be present at his trial if he engages in disruptive and disrespectful behavior requiring his removal from the courtroom). Although it is clear that one can waive Sixth Amendment protections, the boundaries of the waiver rule are not well established. *See* John R. Kroger, The Confrontation Waiver Rule, 76 B.U.L. Rev. 835, 870–77 (1996) (noting that the

---

**6.** We use the terms "waiver" and "forfeiture" interchangeably throughout this opinion to refer to the loss of confrontation rights through misconduct, although we recognize that the two terms have distinct meanings in other contexts. *See, e.g., United States v. Olano*, 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

confrontation waiver rule "implicates six major legal issues that each court must resolve," and noting that four of these issues "provoke sharp disagreement among the federal circuits"). This court, as well as a majority of our sister circuits, have applied the waiver-by-misconduct rule in cases where the defendant has wrongfully procured a witness's silence through threats, actual violence or murder. *See, e.g., U.S. v. Dhinsa,* 243 F.3d 635, 651 (2d Cir.), *cert. denied,* 534 U.S. 897, 122 S.Ct. 219, 151 L.Ed.2d 156 (2001) (collecting cases). With specific regard to the admission of out-of-court statements, the Supreme Court has held that "the Clause permits, where necessary, the admission of certain hearsay statements against a defendant despite the defendant's inability to confront the declarant at trial." *Maryland v. Craig,* 497 U.S. 836, 847–48, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990).

Petitioner challenges the admission of Echevarria's out-of-court statements on three separate grounds. First, he claims that the trial court's determination that petitioner "procured" Echevarria's unavailability by intimidating him constituted a decision "based on an unreasonable determination of the facts in light of the evidence presented" at the *Sirois* hearing. 28 U.S.C. § 2254(d)(2). Second, he argues that the determination of the trial court that he waived his right to confront Echevarria on the substance of the out-of-court statements was an unreasonable interpretation of the bounds of Supreme Court doctrine concerning the right of cross-examination—in other words, an "unreasonable application" of clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). Finally, he argues that the admission of hearsay statements lacking "particularized guarantees of trustworthiness" was "contrary to the clearly established" law set forth by the Supreme Court in *Idaho v. Wright,* 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). 28 U.S.C. § 2254(d)(1).

A. *Was the determination that Cotto "procured" Echevarria's unavailability an "unreasonable determination of the facts in light of the evidence presented"?*

■ As recounted above, the evidence presented at the *Sirois* hearing consisted of the testimony of the following witnesses: Officer Vargas, Detective Quinones, Echevarria, Echevarria's mother, Miriam, and Echevarria's sister, Opelita. In addition, the government introduced the two voice-mail messages to the lead prosecutor left by Echevarria on the eve of his testimony. Officers Vargas and Quinones testified to Echevarria's statements at the previous week's trial preparation sessions, as well as their conversations with Echevarria and his family about the alleged threats. Echevarria's mother also testified that her daughter had informed her about being stopped on the street and asked about her brother's testimony, but Echevarria's sister and Echevarria himself denied that any threats were made.

In its written opinion following the *Sirois* hearing, the trial court concluded: "I credit the testimony of Vargas, Quinones and Miriam Echevarria as being consistent with both the objective evidence and the common sense inferences which arise from it, and [as] thoroughly consistent with one another's testimony in every essential detail." *Cotto,* 642 N.Y.S.2d at 793. The trial court went on to discredit the testimony of Anthony Echevarria and his sister Opelita as inconsistent with the other evidence. *Id.* at 793–94.

The trial court based its determination that threats were made to Echevarria's family and that, as a result, Echevarria "changed his testimony and became un-

available to the People due to intimidation that was either initiated or approved by defendant," on a thorough set of findings of fact entitled to deference on federal habeas review. *Id.* at 796. Specifically, the trial court heard the voicemail messages left for the prosecutor by Echevarria expressing an unwillingness to testify, and concluded that "the panic in his voice in itself renders incredible Echevarria's proffered reasons for expressing concern for his family." *Id.* at 795. After observing Echevarria at the hearing, the trial court indicated that he "appeared to be anxious, uncomfortable and forced in his responses, a demeanor inconsistent with truthfulness and consistent with a state of mind demonstrating a fear of harm to his family or to himself if he should testify against Richard Cotto." *Id.* at 794.

In concluding that the threats were traceable to Cotto, the court found that Cotto "had the opportunity to arrange for Echevarria's intimidation" because he was out on bail both prior to and during the trial. *Id.* at 795. The court also relied on: (1) the timing of the threats, coming immediately after it was revealed that Echevarria would testify against Cotto; (2) the conclusion that defendant was "the only person who stood to benefit" if Echevarria refused to testify; and (3) Cotto's alleged threat to Echevarria immediately after the murder, as recounted to the police by Echevarria—as circumstantial evidence of Cotto's involvement in the threats. *Id.* at 795–96.

The dissenting judges in the New York Court of Appeals voiced concern that Cotto could be deemed to have waived his constitutional right to confront Echevarria on the statements based on "vague allegations of 'word on the street.'" *Cotto,* 92 N.Y.2d at 84, 677 N.Y.S.2d 35, 699 N.E.2d 394. Indeed, *de novo* review might well lead to the conclusion that even if Echevarria and

his family were sincerely afraid, the relatively weak evidence connecting Cotto to the intimidation of Echevarria's family was insufficient to permit the admission of the out-of-court statements. Nonetheless, the degree of deference mandated by 28 U.S.C. § 2254 requires a different conclusion.

■ Under 28 U.S.C. § 2254(e)(1), the fact-findings of the trial court are subject to a "presumption of correctness," a presumption that is particularly important when reviewing the trial court's assessment of witness credibility. *See Sanna v. Dipaolo,* 265 F.3d 1, 10 (1st Cir.2001). As the Court of Appeals noted in upholding the trial court's determination, the "credibility clash" presented at the hearing "has been resolved by findings of the Trial Judge (who observed the witnesses)—affirmed by the Appellate Division—that the People's evidence was credible, the contrary evidence not." *Cotto,* 92 N.Y.2d at 76, 677 N.Y.S.2d 35, 699 N.E.2d 394. On habeas review, the petitioner has the burden of "rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Given the extremely narrow scope of our review, we cannot reverse the trial court's finding that Cotto was behind the intimidation of Echevarria as an "unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(2).

B. *Was the determination that Cotto forfeited his Confrontation Clause and hearsay objections to the out-of-court statements an "unreasonable application" of clearly established Supreme Court law?*

■ Petitioner also claims that the determination of the trial court, as upheld by the New York Court of Appeals, that he had waived his Confrontation Clause and hearsay objections to the out-of-court

statements constituted an "unreasonable application" of clearly established Supreme Court law. 28 U.S.C. § 2254(d)(1). Specifically, petitioner argues that the state court unreasonably extended the forfeiture-by-misconduct principle "to a new context where it should not apply." *Williams v. Taylor,* 529 U.S. 362, 407, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000).[7] We disagree, and reject his claim.

First, the state court's application of this principle here is not at all an extension to a "new context." Indeed, witness intimidation is the paradigmatic example of the type of "misconduct" that can lead to the forfeiture of confrontation rights. *See, e.g., Dhinsa,* 243 F.3d at 651 (collecting cases).

Second, petitioner's claim that the state court unreasonably applied the caselaw on the evidence required to support a finding of forfeiture also must fail. Petitioner argues that the evidence in this case is considerably less direct than that previously deemed sufficient to constitute a forfeiture of confrontation rights in prior cases by this court and other circuits. *See U.S. v. Mastrangelo,* 693 F.2d 269, 271 (2d Cir. 1982) (prosecution produced tape recordings in which defendant threatened murdered witness); *U.S. v. Aguiar,* 975 F.2d 45, 47 (2d Cir.1992) (prosecution introduced a letter with defendant's fingerprints telling the witness to lie; witness also confirmed that defendants had threatened him); *U.S. v. Thai,* 29 F.3d 785, 815 (2d Cir.1994) (informant testified that de-

fendants had personally ordered witness's murder); *see also U.S. v. Houlihan,* 92 F.3d 1271, 1278 (1st Cir.1996), *aff'g in relevant part, U.S. v. Houlihan,* 887 F.Supp. 352, 363–65 (D.Mass.1995) (informant testified that defendants had offered him money to kill potential witness), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997); *U.S. v. White,* 116 F.3d 903 (D.C.Cir.), *cert. denied,* 522 U.S. 960, 118 S.Ct. 390, 139 L.Ed.2d 305 (1997) (eyewitness testified that she saw defendant and co-conspirator kill witness).

Petitioner's argument regarding the sufficiency of the evidence does have some force. Certainly, confrontation rights may only be waived by a defendant through a "knowing and intentional relinquishment." *Dhinsa,* 243 F.3d at 651 (quoting *Houlihan,* 92 F.3d at 1279); *cf. Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) ("There is a presumption against the waiver of constitutional rights, and for a waiver to be effective it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege.") (internal quotation marks and citations omitted). But there is no Supreme Court caselaw definitively establishing the circumstances sufficient, or the standard of proof applicable, in analyzing waiver cases under the Confrontation Clause. *Cf.* Fed. R.Evid. 804(b)(6) Advisory Committee's Notes to 1997 amendment ("Every circuit that has resolved the question has recognized the principle of forfeiture by miscon-

---

**7.** Petitioner does not challenge the idea that a witness such as Echevarria, who actually testifies at trial, can be considered "unavailable" for Confrontation Clause purposes. *Cf. U.S. v. Tocco,* 135 F.3d 116, 129 (2d Cir.), *cert. denied,* 523 U.S. 1096, 118 S.Ct. 1581, 140 L.Ed.2d 795 (1998) (declining to decide whether witness's refusal to confirm prior statements due to intimidation constituted "absence within the meaning of *Mastrange-*

*lo"*). Nor does he argue that the *Sirois*/Mastrangelo test for waiver is unconstitutional and in violation of Supreme Court precedent. *See, e.g.,* Kroger, *supra,* 76 B.U.L. Rev. at 870–77 (arguing that *Mastrangelo* test violates *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) and other Supreme Court precedent). We therefore need not consider these issues.

duct, although the tests for determining whether there is a forfeiture have varied.") (citing cases). And petitioner offers no compelling reason why the evidence of "intentional relinquishment" cannot be circumstantial, as was the case here.

■ In fact, our own circuit's requirement on the standard of proof applicable at a federal *Mastrangelo* hearing—that the government prove by a preponderance of the evidence that the defendant procured the witness's unavailability—is actually less stringent than the New York standard, which requires a showing of intimidation by clear and convincing evidence. *Compare Mastrangelo*, 693 F.2d at 272 (preponderance of the evidence standard) *with Geraci*, 85 N.Y.2d at 362, 625 N.Y.S.2d 469, 649 N.E.2d 817 (clear and convincing standard).

■ Finally, the "objectively unreasonable" standard of § 2254(d)(1) means that petitioner must identify "some increment of incorrectness beyond error." *See Fuller v. Gorczyk*, 273 F.3d 212, 219 (2d Cir. 2001); *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir.2000). Given the extensive federal precedent recognizing that the admission of out-of-court statements is appropriate when a defendant has intimidated a witness, and the absence of "clearly established" Supreme Court law limiting the circumstances that constitute forfeiture by misconduct, we cannot conclude that the New York Court of Appeals' determination was an "unreasonable application" of clearly established Supreme Court law.

C. *Did the statements bear sufficient "indicia of reliability"?*

■ Petitioner also argues that the admission of Echevarria's statements violates the clearly established Supreme Court holding of *Idaho v. Wright*, 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638

(1990), because Echevarria's statements lacked indicia of reliability. In *Idaho v. Wright*, the Supreme Court reaffirmed that the state bears the burden of proving that hearsay statements bear "sufficient indicia of reliability" to withstand scrutiny under the Confrontation Clause. *Id.* at 816, 110 S.Ct. 3139. Following *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1990), the Court explained that the "indicia of reliability" requirement is met in either of two circumstances: "where the hearsay statement 'falls within a firmly rooted hearsay exception,' or where it is supported by 'a showing of particularized guarantees of trustworthiness.'" *Id* (quoting *Roberts*, 448 U.S. at 66, 100 S.Ct. 2531).

■ In *Dhinsa*, we held, however, that a defendant who engages in misconduct waives any Confrontation Clause challenge to the admission of hearsay testimony from a witness whose unavailability was "procured" by the defendant. *See Dhinsa*, 243 F.3d at 655. Nonetheless, relying on our decision in *Aguiar*, petitioner argues that the due process clause independently protects against the admission of unreliable hearsay statements even when any Confrontation Clause challenge has been waived. *See Aguiar*, 975 F.2d at 47 ("[w]e may assume that the admission of facially unreliable hearsay would raise a due process challenge").

Indeed, as part of the *Sirois* hearing, the prosecution argued for admission on the ground that the statements had "particularized guarantees of trustworthiness," and the trial court agreed. The Appellate Division upheld this ruling, calling the statements "highly reliable." *Cotto*, 240 A.D.2d at 193, 658 N.Y.S.2d 278.

■ In concluding that the statements had "sufficient indicia of reliability to satisfy due process," the Court of Ap-

peals relied on the following factors: (1) "Echevarria's statements were repeated only days after they had first been made, were (according to the affirmed findings) lucid and credible, and described in detail defendant's actions both before and after the shooting"; (2) the statements "were made on two separate occasions, and recounted in the testimony of two witnesses subject to cross-examination, thus making it unlikely that Echevarria was misunderstood"; and (3) "the testimony indicated that Echevarria received no special treatment from the police and had no motive to change his original story and put himself or his family at risk." *Cotto*, 92 N.Y.2d at 77–78, 677 N.Y.S.2d 35, 699 N.E.2d 394. The Court of Appeals' conclusion that these factors constitute "sufficient indicia of reliability" is properly considered a mixed question of law and fact, analyzed under the "unreasonable application" prong of § 2254(d)(1). *Cf. Lilly v. Virginia*, 527 U.S. 116, 135–37, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion) (examining reliability issue in Confrontation Clause context).

As we explain more fully below in considering the second issue certified on appeal, we disagree with the Court of Appeals' conclusion on this third factor that Echevarria had "no motive" to change his original story. Nonetheless, the Court of Appeals' conclusion that the statements were "sufficiently reliable" to be presented to the jury, as supported by the other two factors considered, is not objectively unreasonable.

In sum, we conclude that the determination that petitioner procured Echevarria's unavailability was not an "unreasonable determination of the facts in light of the evidence presented" at the *Sirois* hearing, and the legal conclusion that Echevarria's out-of-court statements should then be admitted was neither "contrary to" nor an "unreasonable application of" clearly established Supreme Court law.

## III. The Preclusion of Cross–Examination

### A. *Procedural Bar*

As to the second issue certified for appeal, whether the complete preclusion of cross-examination of Echevarria violated the Confrontation Clause, respondent argues that we cannot consider this issue because (1) it lies outside of the certificate of appealability issued by the District Court; (2) petitioner failed to exhaust this claim on direct appeal; and (3) petitioner is procedurally barred from raising this claim because he failed to make a timely objection at trial. For the reasons that follow, we reject respondent's arguments, and conclude that it is appropriate to consider the merits of petitioner's claim.

### 1. *Scope of Certificate of Appealability*

As a threshold matter, we must determine the scope of the certificate of appealability (COA). Respondent argues that we cannot consider the question of whether *Cotto*'s cross-examination claim is procedurally defaulted because the District Court did not explicitly include its procedural default ruling in the COA.

▪ Although the COA fails to expressly include the District Court's procedural default finding, we may construe the filing of a notice of appeal to be a request to this Court for a COA on all issues raised in the appeal. *See El Rhagi v. Artuz*, 309 F.3d 103, 106 (2d Cir.2002) (per curiam) (petitioner's notice of appeal construed as "an application for a COA on the procedural-bar issue"); Fed. R.App. P. 22(b)(2) (authorizing the Court of Appeals to construe the notice of appeal as a request for a certificate of appealability).

■ We may therefore amend the COA to include the procedural-bar issue, even if the District Court declined to include the procedural-bar question in its initial COA, if Cotto makes the necessary showing "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1034, 154 L.Ed.2d 931 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000)). Because we conclude that Cotto has made the necessary showing in this case, *see infra*, we hereby amend the COA to include the procedural-bar issue.

### 2. *Exhaustion Requirement*

■ Respondent further argues that petitioner is barred from raising the cross-examination claim on federal habeas review because the claim was not fairly presented to the state courts. It is well-established that "a state prisoner must normally exhaust available state judicial remedies before a federal court will entertain his petition for habeas corpus." *Picard v. Connor*, 404 U.S. 270, 275, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (citing *Ex parte Royall*, 117 U.S. 241, 6 S.Ct. 734, 29 L.Ed. 868 (1886)). This exhaustion requirement is rooted in considerations of comity, and is codified by statute at 28 U.S.C. § 2254(b) & (c). *See Strogov v. Attorney Gen. of N.Y.*, 191 F.3d 188, 191 (2d Cir. 1999), *cert. denied*, 530 U.S. 1264, 120 S.Ct. 2723, 147 L.Ed.2d 987 (2000); *Dorsey v. Kelly*, 112 F.3d 50, 52 (2d Cir.1997). A petitioner satisfies the "fair presentation" aspect of the exhaustion requirement by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it. *Ramirez v. Attorney Gen. of N.Y.*, 280 F.3d 87, 94 (2d Cir.2001).

■ Respondent argues that Cotto's claim was not "fairly presented" because on direct appeal, petitioner "explicitly eschew[ed] reliance on the federal constitution." Respondent points out that in his briefs to both the Appellate Division and Court of Appeals, petitioner argued that the problem with the complete preclusion of cross-examination of Echevarria was that the trial court "explicitly abandon[ed] state law in favor of the federal rule." We disagree with respondent's characterization of petitioner's argument on direct appeal, and agree with petitioner and the District Court that the claim was fairly presented to the state courts.

■ First, we reject respondent's suggestion that petitioner "explicitly eschewed" reliance on federal constitutional law; rather, petitioner questioned the state court's decision not to follow *Geraci*, the seminal opinion of the New York Court of Appeals relating to the forfeiture of federal confrontation rights through misconduct. Indeed, *Geraci*'s discussion of the "constitutional right of confrontation" is supported by cites exclusively to federal cases. *Geraci*, 85 N.Y.2d at 366, 625 N.Y.S.2d 469, 649 N.E.2d 817. As we have previously recognized, "a state defendant may fairly present to the state courts the constitutional nature of his claim, even without citing chapter and verse of the Constitution" so long as he relies "on pertinent federal cases employing [the relevant] constitutional analysis" or alleges "a pattern of facts" that clearly implicates a specific constitutional provision. *See Strogov*, 191 F.3d at 191 (quoting *Daye v. Attorney Gen.*, 696 F.2d 186, 191 (2d Cir. 1982) (in banc)).

Second, unlike other cases when we have ruled that a habeas claim was not fairly presented to the state courts, the

cross-examination claim was explicitly advanced in petitioner's brief to the Court of Appeals. In the relevant section of petitioner's Court of Appeals brief, petitioner mentions in the first sentence "the right to cross-examine," and the second and third sentences of this section of petitioner's brief both reference "confrontation rights." Indeed, as respondent pointed out in its own Court of Appeals brief, *Geraci* itself analyzed the loss of "the valued Sixth Amendment confrontation right." (Brief at 34; quoting *Geraci*, 85 N.Y.2d at 367, 625 N.Y.S.2d 469, 649 N.E.2d 817).[8]

In light of these facts, we reject the notion that the New York Court of Appeals was not adequately apprised that Cotto's challenge to the "full-scale abrogation of [his] confrontation rights," as he put it in his brief to that court, was based on the Sixth Amendment. Indeed, the Court of Appeals' dissent, with its discussion of how the trial court's ruling "deprived the defendant of his right of confrontation," belies respondent's argument that the court was unaware of the federal constitutional basis of Cotto's cross-examination claim.

### 3. *Independent and Adequate State Grounds*

■■■■ Under the independent and adequate state grounds doctrine, the Supreme Court "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). "This rule applies whether the state law ground is substantive or procedural." *Id.* Although the independent and adequate state grounds doctrine first arose in the context of direct appeals to the Supreme Court from state court judgments, the Supreme Court has applied it as well "in deciding whether federal district courts should address the claims of state prisoners in habeas corpus actions." *Lee v. Kemna*, 534 U.S. 362, 375, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002) (quoting *Coleman*, 501 U.S. at 729, 111 S.Ct. 2546.) In the habeas context, however, the doctrine is prudential rather than jurisdictional. *See Lambrix v. Singletary*, 520 U.S. 518, 522–23, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997); *Coleman*, 501 U.S. at 730, 111 S.Ct. 2546 (1991); *Spence v. Super., Great Meadow Corr. Facility*, 219 F.3d 162, 170 (2d Cir.2000) ("The doctrine of procedural default is based on considerations of comity and finality, and not on a jurisdictional limitation on the power of a federal court under 28 U.S.C. § 2254 to look beyond a state procedural default and consider the merits of a defaulted claim that asserts a constitutional violation.").[9]

---

**8.** Tellingly, respondent does not argue that petitioner relied on state confrontation rights in lieu of the federal Constitution. New York's constitution does provide that "[i]n any trial in any court whatever the party accused shall … be confronted with the witnesses against him." N.Y. Const., Art. 1, § 6.

**9.** "Thus, procedural default is normally a 'defense' that the state is 'obligated to raise' and 'preserve' if it is not to 'lose the right to assert that defense thereafter.'" *Trest v. Cain*, 522 U.S. 87, 89, 118 S.Ct. 478, 139 L.Ed.2d 444 (1997) (quoting *Gray v. Netherland*, 518 U.S. 152, 166, 116 S.Ct. 2074, 135 L.Ed.2d 457 (1996)); *see also Mask v. McGinnis*, 233 F.3d 132, 137 (2d Cir.2000), *cert. denied*, 534 U.S. 943, 122 S.Ct. 322, 151 L.Ed.2d 240 (2001). Because the procedural bar is a defense to a habeas claim, we assume without deciding that the state bears the burden of proving the adequacy of the state procedural rule. *See Bennett v. Mueller*, 296 F.3d 752, 761–63 (9th Cir.2002); *Hooks v. Ward*, 184 F.3d 1206, 1216–17 (10th Cir.1999); *but see Sones v. Hargett*, 61 F.3d 410, 416–17 (5th Cir.1995). Neither side has raised the burden issue in this case.

Here, in considering the claim that the trial court "improperly precluded [Cotto] from any cross-examination of Echevarria," the Court of Appeals concluded that this contention "was not raised by objection before the trial court and is thus unpreserved for our review." *Cotto*, 92 N.Y.2d at 78, 677 N.Y.S.2d 35, 699 N.E.2d 394. As a result, the Court of Appeals declined to address the merits of Cotto's claim that complete preclusion of cross-examination was improper, based on its implicit conclusion that Cotto did not comply with the contemporaneous objection rule codified in N.Y. Criminal Procedure Law § 470.05(2) at trial. *Cotto*, 92 N.Y.2d at 78, 677 N.Y.S.2d 35, 699 N.E.2d 394. The question, then, is whether this case falls within "the small category of cases in which [the] asserted state grounds are inadequate to block adjudication of the federal claim" or "in which the exorbitant application of a generally sound rule renders the state ground inadequate" to bar consideration of the federal constitutional claim. *Lee*, 534 U.S. at 376, 381, 122 S.Ct. 877.

### a. *Standard for Adequacy*

In this case, there is no question that the claimed procedural bar constitutes an "independent" state ground of decision; the dispute is over whether the asserted bar is "adequate" to preclude federal habeas review. "[T]he question of when and how defaults in compliance with state procedural rules can preclude . . . consideration of a federal question is itself a federal question." *Garcia v. Lewis*, 188 F.3d 71, 77 (2d Cir.1999) (quoting *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct.

1981, 100 L.Ed.2d 575 (1988) (internal quotations omitted)); *Lee*, 534 U.S. at 375, 122 S.Ct. 877 (it is not within the state's prerogative to decide whether a state rule is sufficient to bar consideration of a federal claim; adequacy itself is a federal question). Before accepting a procedural bar defense, a federal court must examine the adequacy of the alleged procedural default. *Garcia*, 188 F.3d at 77. For although the procedural bar rule rests on considerations of comity, "[s]tate courts may not avoid deciding federal issues by invoking procedural rules that they do not apply evenhandedly to all similar claims." *Id.* (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 263, 102 S.Ct. 2421, 72 L.Ed.2d 824 (1982)). As we explained in *Garcia*:

> [A] procedural bar will be deemed adequate only if it is based on a rule that is firmly established and regularly followed by the state in question. When a federal court finds that the rule is inadequate under this test the rule should not operate to bar federal review. Nonetheless, the principles of comity that drive the doctrine counsel that a federal court that deems a state procedural rule inadequate should not reach that conclusion lightly or without clear support in state law.

*Id.* (internal citations and quotations omitted).[10]

Since *Garcia*, our last extended discussion of the adequacy doctrine on federal habeas review, the Supreme Court has clarified the nature and scope of the adequacy inquiry. In *Lee*, the Supreme Court made clear that although "[o]rdinarily, a violation of 'firmly established and

---

10. Although "a habeas petitioner may also bypass the independent and adequate state ground bar by demonstrating a constitutional violation that resulted in a fundamental miscarriage of justice, *i.e.,* that he is actually innocent of the crime for which he has been convicted," *Dunham v. Travis*, 313 F.3d 724, 729 (2d Cir.2002) (citing *Schlup v. Delo*, 513 U.S. 298, 321, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995)), petitioner does not make such a claim here.

regularly followed' state rules ... will be adequate to foreclose review of a federal claim," there are "exceptional cases in which exorbitant application of a generally sound rule renders the state ground inadequate to stop consideration of a federal question." 534 U.S. at 376, 122 S.Ct. 877. In determining that Lee's case fit "within that limited category," *id.*, the Court relied on three considerations: (1) whether the alleged procedural violation was actually relied on in the trial court, and whether perfect compliance with the state rule would have changed the trial court's decision; (2) whether state caselaw indicated that compliance with the rule was demanded in the specific circumstances presented; and (3) whether petitioner had "substantially complied" with the rule given "the realities of trial," and, therefore, whether demanding perfect compliance with the rule would serve a legitimate governmental interest. Although these three factors were not presented as a "test" for determining adequacy, we use them as guideposts in "evaluat[ing] the state interest in a procedural rule against the circumstances of a particular case." 534 U.S. at 381–85, 122 S.Ct. 877. Most importantly, Lee clarified, over strong dissenting objections by three Justices, that the adequacy of a state procedural bar is determined with reference to the "particular application" of the rule; it is not enough that the

rule "generally serves a legitimate state interest." 534 U.S. at 387, 122 S.Ct. 877.

After *Lee*, then, respondent's argument that it is "firmly established and regularly followed" that New York's contemporaneous objection rule applies to all trial-related proceedings, including *Sirois* hearings, misses the point. Cotto does not claim that New York's contemporaneous objection rule is generally "inadequate" to preclude federal habeas review, but rather that the rule is "misapplied in his case in particular." *Garcia*, 188 F.3d at 79. More precisely, the relevant question here is not whether New York's contemporaneous objection rule applies to *Sirois* hearings, whether the Court of Appeals "right[ly] or wrong[ly]" decided that the claim was unpreserved under state law, or even whether the Court of Appeals' decision has a "fair or substantial basis in state law." *El Rhagi*, 309 F.3d at 107 (quoting *Garcia*, 188 F.3d at 77–78).[11] Rather, the question is whether application of the procedural rule is "firmly established and regularly followed" in the specific circumstances presented in the case, an inquiry that includes an evaluation of the asserted state interest in applying the procedural rule in such circumstances. *See Lee*, 534 U.S. at 386–87, 122 S.Ct. 877 (questioning whether the dissent "would fully embrace the unyielding theory that it is never appropriate to evaluate the state interest in a procedural

11. In *Garcia*, we noted that in addressing the question of adequacy, the court "should inquire whether there was a 'fair or substantial basis' in state law for the default"—a formulation imported to the habeas context from Supreme Court cases involving the direct review of state court judgments. *Garcia*, 188 F.3d at 77–78. Although some courts have treated *Garcia's* "fair or substantial basis" formulation as prescribing an additional layer of deference on top of the independent and adequate state grounds doctrine, we do not read it that way, and respondent does not make such a claim. Rather, in the habeas context,

the "fair or substantial basis" formulation simply emphasizes the comity considerations that underscore federal review. *See id.* at 77 (a federal court that deems a state procedural rule inadequate should not reach that conclusion "lightly or without clear support in state law"). We note that neither the majority nor the dissent in *Lee v. Kemna*, 534 U.S. 362, 122 S.Ct. 877, 151 L.Ed.2d 820 (2002), the most recent Supreme Court case to address when a claimed procedural bar is adequate to preclude federal habeas review, refers to the "fair or substantial basis" formulation.

rule against the circumstances of a particular case").

### b. *The Circumstances of the Ruling Precluding Cross–Examination in this Case*

As described above, after Echevarria testified that he did not see who shot Davilla, the trial court excused Echevarria and the jury, and discussed with the parties the appropriate step to take, including the possibility of a *Sirois* hearing. The ensuing discussion of whether or not to have such a hearing included the following colloquy:

> Defense Counsel: I mean we are now going to pile on witnesses that we can't cross-examine. It just seems it's a bit over much ...
>
> I can only say that we have an investigator on this case, our investigator does all our investigation and we had decided given Mr. Echevarria's prior record, that there was no need for any further investigation that we would rely completely upon what we had learned using that prior record in order to impeach him and discredit his testimony.
>
> The Court: Certainly he has quite a record .... Anything else ...?
>
> Defense Counsel: No, Judge, I think that *Geraci* went into some lengths in discussing that this State will hold the highest standard for this kind of hearing which would be clear and convincing proof, that indeed the person was somehow connected and **did waive by his misconduct the right to cross-examine a witness.** In this case where the—as I see it, each of the eyewitnesses is non identifying until

such point that the District Attorney's office get a hold of them **and to not allow me to cross-examine Mr. Echevarria on any or all of his background** and to allow them to put in this statement **is really totally completely unfair.**

> The Court: OK. Thank you. I'm going to let the People have a chance at a hearing to try to meet their burden of providing clear and convincing evidence that Mr. Cotto is responsible for Echevarria's refusal to testify as he has in the past. I think that's the appropriate step for me to take now.

(Tr. 385–87) (emphasis added).

At the close of the *Sirois* hearing a few days later, the trial court made both factual and legal findings, concluding:

> I am following what I believe to be the line of cases emanating from *Reynolds v. United States* in 1878 and continuing through *Geraci* which I think under the circumstances indicates that when the Court finds the defendant has committed misconduct which results in the unavailability of witness he forfeits his right for confrontation as for all purposes as to that witness. I will not permit cross of Mr. Echevarria by the defense as to his testimony thus far because the jury will have before it Echevarria's live direct testimony as well as his conflicting out-of-court statement to the police, none of which the defense will be cross-examining about.

(Tr. 1085–86.)[12]

When the trial court had finished summarizing its ruling, defense counsel said: "Can I just get some clarification on the limits of cross-examination. When Police Officer Vargas and Detective Quinones

---

**12.** In the written opinion, the trial court further explained:

> As already noted, under the law of New York a defendant whose misconduct causes the unavailability of an adverse witness forfeits his right to confront and cross-examine that witness on the substance of the out-of-court statements received in evidence as a consequence of the defendant's misconduct. (*People v. Geraci, supra,* at 367, 625

take the stand, my understand [sic] being is that I cannot question them at all about the res gestae of the statement, I guess, of the statement, I would say." Respondent argues—and the Court of Appeals apparently agreed—that because defense counsel did not specifically object at that time, after the trial court's *Sirois* ruling, that cross-examination of Echevarria was completely precluded, the claim was unpreserved for review.

### c. Application of the Lee Factors

The question, then, is whether the requirement of an additional objection was "firmly established and regularly followed" in these circumstances. The Supreme Court has noted that the contemporaneous objection rule rests on "the general principle that an objection which is ample and timely to bring the alleged federal error to the attention of the trial court and enable it to take appropriate corrective action is sufficient to serve legitimate state interests, and therefore sufficient to preserve the claim for review." *Osborne v. Ohio*, 495 U.S. 103, 125, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (quoting *Douglas*, 380 U.S. at 422, 85 S.Ct. 1074). Like the *Lee* and *Osborne* courts, that overall principle, along with the three factors relied upon in *Lee*, guides our judgment in this case.

### i. Whether the Procedural Violation Actually Affected the Trial Court Ruling

In reaching the conclusion that the procedural bar was inadequate in *Lee*, the Supreme Court relied in part upon the fact that the lack of compliance with the procedural rule at issue was not mentioned in the trial court as a reason to deny Lee's motion for continuance. This rationale— whether the alleged procedural violation was actually relied on in the trial court—is less applicable in this case because the lack of a contemporaneous objection would not, almost by definition, be mentioned by the trial court. Thus this factor does not weigh as heavily in favor of Cotto as it did for Lee.

However, as to whether perfect compliance with the state rule would have changed the trial court's decision, there are similarities between the circumstances in this case and *Lee*. Here, the trial court was certainly aware of defense counsel's desire to cross-examine Echevarria, given counsel's statement that "to not allow me to cross-examine Mr. Echevarria on any or all of his background ... is really totally completely unfair" at the beginning of the *Sirois* hearing, and the court's own written and oral ruling precluding such cross-examination at the close of the hearing. Cotto was precluded from cross-examining Echevarria because the trial court determined that cross-examination would "serve no truth-seeking purpose," and because the trial court concluded that our prior decision in *Aguiar* indicated that Cotto had forfeited any opportunity to cross-examine Echevarria through his misconduct. Thus, if defense counsel had repeated her pre-hearing objection, that it would be "unfair to not allow" cross-examination of Echevarria altogether, after the trial court's ruling, there is no reason to believe

N.Y.S.2d 469, 649 N.E.2d 817.) In this case, however, it would seem appropriate to follow the Federal rule, which holds that the defendant who commits such misconduct forfeits his right of confrontation for all purposes as to that witness. (*United States v. Aguiar, supra,* at 47.) No truthserving function will be served by allowing defendant to cross-examine Echevarria on any subject, under the circumstances here presented. Because the jury will have before it Echevarria's live direct testimony as well as his out-of-court statements to the police, however, an appropriate limiting instruction will be given to the jury by the court. 92 N.Y.2d at 76, 677 N.Y.S.2d 35, 699 N.E.2d 394.

that the trial court would have changed its mind.[13]

On the other hand, the likely impact of a timely objection involves a certain degree of speculation. Indeed, the purpose of the contemporaneous objection rule is to give the trial court a clear opportunity to correct any error. Although requiring an additional objection after the trial court made its waiver ruling may not have changed matters, it is possible that defense counsel, either before the hearing began or during the course of the hearing, could have argued to the trial court that *Aguiar* did not stand for the proposition that *cross-examination* of a testifying witness was forfeited through misconduct. Through argument, or perhaps a request for an opportunity to brief the issue, the trial court may well have come to a different conclusion. Therefore, although we agree with petitioner's basic argument that this is not a case where a party failed to apprise the trial court of the ruling sought, we do not think that this factor weighs as heavily in Cotto's favor as it did for the petitioner in *Lee*.

### ii. *New York's Statute and Case Law*

New York's preservation rule, codified at N.Y. Criminal Procedure Law § 470.05(2), specifies that:

[f]or purposes of appeal, a question of law with respect to a ruling or instruction of a criminal court during a trial or proceeding is presented when a protest thereto was registered, by the party claiming error, at the time of such ruling or instruction or at any subsequent time when the court had an opportunity of effectively changing the same. Such protest need not be in the form of an "exception" but is sufficient if the party made his position with respect to the ruling or instruction known to the court, or if in response to a protest by a party, the court expressly decided the question raised on appeal.[14]

In analyzing the adequacy of the claimed procedural bar, we look to the statute and caselaw interpreting New York's statutory preservation rule in criminal proceedings. *See, e.g., Lee,* 534 U.S. at 382, 122 S.Ct. 877 ("[N]o published Missouri decision directs flawless compliance with [the state procedural rule] in the unique circumstances this case presents."); *Arce v. Smith,* 889 F.2d 1271, 1273 (2d Cir.1989), *cert. denied,* 495 U.S. 937, 110 S.Ct. 2185, 109 L.Ed.2d 513 (1990) (analyzing New York cases to determine whether the claim raised by the petitioner "is not regularly the subject of a procedural default in New York").

13. The trial court's understanding of the Confrontation Clause issue at stake is further underscored by its response to defense counsel's request for clarification at the conclusion of the *Sirois* hearing. The trial court reiterated the limitations on any cross-examination of Echevarria, saying: "I'm not sure what you mean by that. Let me give it a try to make my intention clear ... I'm saying you forfeit under *Geraci* your right to cross Echevarria as to those out-of-court statements. When I read *Reynolds v. United States* they were citing in 1878, decisions from 1666, I think it is well settled. It certainly has been recognized here since the *Matter of Holzman v. Hellenbrand* in 1982 or whatever. I don't think you are entitled to cross him based on my finding

of misconduct. But, you may certainly cross away Officer Vargas and Detective Quinones about their reliability in reporting what they heard." (Tr. 1089.)

14. Though the word "protest" is not explicitly defined in the statute, § 470.05(2)'s explanation of when a protest is "sufficient" for preservation purposes—if either (1) "the party made his position with respect to the ruling or instruction known to the court," or (2) "if in response to a protest by a party, the court expressly decided the question raised on appeal"—is used to determine when "a protest thereto was registered, by the party claiming error." *Id.*

Respondent cites several New York cases, and our own opinion in *Garcia*, in support of the proposition that New York's contemporaneous objection rule is "firmly established and regularly followed" in these circumstances. Petitioner cites several New York cases in support of the opposite conclusion. For the reasons that follow, we conclude that petitioner has the better of the argument.

Respondent contends that the issue here is whether "after the court has issued its ruling on the merits and announced the relief it was awarding the moving party, New York regularly requires a complaint about that relief [granted] to preserve the claim that the relief ordered was wrong." In support of such a requirement, respondent primarily cites several Appellate Division cases involving *Hinton* hearings, state proceedings to determine whether the courtroom should be closed, either completely, or to certain individuals, during the course of trial. *See, e.g., People v. Lucas*, 290 A.D.2d 304, 736 N.Y.S.2d 332 (1st Dep't 2002); *People v. Williams*, 287 A.D.2d 337, 731 N.Y.S.2d 436 (1st Dep't 2001); *People v. Lanhorn*, 283 A.D.2d 254, 724 N.Y.S.2d 608 (1st Dep't 2001). Respondent also argues that the circumstances here are very similar to those in *Garcia*, a case also involving a *Hinton* hearing.

We conclude, however, that these cases are distinguishable. In *Garcia*, we relied on the fact that the defendant had "failed to put the trial judge on notice as to what the defendant now claims he wanted"—in that case, the presence of his mother's companion in the courtroom—and so failed to preserve his claim. *Garcia*, 188 F.3d at 80–81. Similarly, in the Appellate Division cases cited by respondent, the defendants expressed no dissatisfaction with the relief ordered. Here, in contrast, before the *Sirois* hearing even began, defendant

made clear his position on the preclusion of cross-examination: "[T]o not allow me to cross-examine Mr. Echevarria on any or all of his background ... is really totally completely unfair." Given *Lee*'s case-specific inquiry, we conclude that the cases cited by respondent do not control here, where the trial court could not have doubted that counsel wanted to cross-examine Echevarria.

Further, other New York cases interpreting the scope of CPL § 470.05(2) undercut respondent's claim. Since our decision in *Garcia* and the Court of Appeals' decision denying Cotto's direct appeal, the Court of Appeals has held that, under similar circumstances to those presented in this case, an issue of law is preserved even if it is not specifically raised by the defendant so long as the trial court expressly rules on the issue following an earlier objection. In *People v. Edwards*, 95 N.Y.2d 486, 719 N.Y.S.2d 202, 741 N.E.2d 876 (2000), the Court of Appeals reached the merits of a probable cause issue, decided by the trial court at the close of a suppression hearing. In so doing, the court specifically held that "contrary to the People's contention, the issue of probable cause to arrest is preserved for our review because, in its written decision denying defendant's motion to suppress, the trial court 'expressly decided' the question in response to a 'protest by a party.'" *Id.* at 491 n. 2, 719 N.Y.S.2d 202, 741 N.E.2d 876 (citing CPL § 470.05(2)).

Intermediate appellate courts in New York have followed the same principle. *See, e.g., People v. Ayala*, 142 A.D.2d 147, 157, 534 N.Y.S.2d 1005, 1011 (2nd Dept 1988), *aff'd*, 75 N.Y.2d 422, 554 N.Y.S.2d 412, 553 N.E.2d 960 (1990) (in case where "protest" was made by the government, issue pressed by defense on appeal was still preserved because "a question of law is preserved if the point was expressly

decided by the trial court in response to a protest, even though the protesting party overlooked that argument when making the protest") (quoting Preiser, *Supp. Practice Commentaries*, McKinney's Cons. Laws of NY, Book 11A, CPL 470.05, 1988 Pocket Part, at 5)[15]; *People v. Seabrook*, 241 A.D.2d 325, 326, 659 N.Y.S.2d 463, 464 (1st Dept 1997) (defense counsel's motion to share responsibilities with counsel for co-defendant preserved issue of law as to all parts of ruling despite failure to specifically object); *People v. Duncan*, 177 A.D.2d 187, 190–91, 582 N.Y.S.2d 847, 849–50 (4th Dept 1992) (defendant's litigation of *Batson* hearing preserved issue of law as to ruling on prosecutor's peremptory challenges); *People v. Johnson*, 144 A.D.2d 490, 491, 534 N.Y.S.2d 207, 209 (2d Dept 1988) (defense objection to the admissibility of photographs preserved issue of law as to whether they were admissible under collateral evidence rule, even though the ground was not specifically raised at trial). In short, CPL § 470.05 and the governing New York caselaw does not indicate that Cotto was required to make an additional objection after the litigated hearing in order to preserve his confrontation claim for appellate review.

### iii. *Substantial Compliance With the Rule Given the "Realities of Trial"*

In evaluating whether Cotto "substantially complied" with CPL § 470.05, *Lee*, 534 U.S. at 382, 122 S.Ct. 877, we return to the asserted state interest behind the contemporaneous objection rule—to ensure that the parties draw the trial court's attention to any potential error while there is still an opportunity to address it. *See Osborne*, 495 U.S. at 125, 110 S.Ct. 1691;

*see also* Preiser, *Practice Commentaries*, McKinney's Cons. Laws of New York (1994), Book 11A, CPL 470.05, at 12 [hereinafter Practice Commentaries] ("[T]he rules ... are best understood in the context of the purpose for requiring a protest, which is to call the trial court's attention to the claimed error while there still is time to correct it."). "The Supreme Court has recognized that contemporaneous objection rules of this kind serve [ ] legitimate state interest[s]" in ensuring that judges are promptly alerted to errors at trial, *see Garcia*, 188 F.3d at 78, and we in no way question the importance of that interest here. However, for the reasons that follow, we conclude that Cotto's conduct at trial served the purpose underlying the rule, and therefore CPL § 470.05(2)'s "essential requirements ... were substantially met in this case." *Lee*, 534 U.S. at 385, 122 S.Ct. 877.

First, we again note that before the *Sirois* hearing even began, defense counsel indicated that a total bar on cross-examination was unfair. Although defense counsel did not (and was not required to) use the specific words "Confrontation Clause," it is well established, and certainly no secret to criminal law practitioners and judges, that cross-examination of testifying witnesses is mandated by the Sixth Amendment's Confrontation Clause. Moreover, defense counsel then spent three days, in the middle of trial, litigating the *Sirois* hearing in order to challenge the prosecution's contention that Cotto had forfeited his confrontation rights through misconduct. At this point, it seems difficult to argue that defendant had not "made his position with respect to the ruling known to the court." CPL § 470.05(2). Indeed, the litigation of the

---

**15.** As petitioner points out, the Court of Appeals' affirmance of *Ayala* on the merits necessarily required a threshold finding that the issue raised therein was preserved. *See People v. Ayala*, 75 N.Y.2d 422, 554 N.Y.S.2d 412, 553 N.E.2d 960 (1990).

hearing itself was an assertion of Cotto's right to confront Echevarria. As the Court of Appeals dissent put it, "[i]t should be clear ... that defense counsel did oppose the prosecutor's efforts to admit the out-of-court statements into evidence, arguing that the evidence that defendant threatened the witness was not clear and convincing *and protesting the loss of the right of cross-examination.* Thus, in accordance with CPL § 470.05, defendant made clear what ruling was desired." *Cotto,* 92 N.Y.2d at 84, 677 N.Y.S.2d 35, 699 N.E.2d 394 (Smith, J., dissenting) (emphasis added).

Despite these "ample and timely" indications of the "alleged federal error" that no doubt caught "the attention of the trial court," *Osborne,* 495 U.S. at 125, 110 S.Ct. 1691, respondent argues that defendant failed to make his position sufficiently clear. After the court's ruling, defense counsel asked only for clarification of the bounds of cross-examination of the police officers, who were about to testify, and it is the lack of continued objection at this point, according to respondent, that is fatal to petitioner's claim.

We must disagree. Like the Court in *Lee,* our inquiry is guided by the "realities of trial"—namely, that defense counsel's final query came (1) after the conclusion of a three-day hearing to consider whether Cotto had forfeited his confrontation right and hearsay objections with respect to Echevarria; (2) after a prior, explicit objection to the preclusion of cross-examination; and (3) with the awareness that two police officers were about to take the stand and provide the first, and only, testimony that an eyewitness had identified Cotto as the shooter. Thus, like the Court in *Osborne,* we ask whether anything "would be gained" by requiring Cotto's lawyer "to object a second time," and similarly answer the question "with a firm 'no.'" *See*

*Lee,* 534 U.S. at 379, 122 S.Ct. 877 (discussing *Osborne*). In sum, although the assertion of the state procedural bar here is not as egregious as in *Lee,* we conclude that "unyielding application of the general rule" in the circumstances of this case, given Cotto's substantial compliance with CPL § 470.05, "would disserve any perceivable [state] interest." 534 U.S. at 381, 122 S.Ct. 877.

Finally, we note that Cotto's compliance with New York's preservation rule here was arguably literal, and not just substantial. In 1986, the last clause of CPL § 470.05(2), beginning "or if in response...," was added by the Legislature to *"further broaden the circumstances* under which a protest during a criminal trial or proceeding will be sufficient to preserve the question of law for subsequent appellate review." Practice Commentaries, at 11 (emphasis added); *see also* L. 1986, c. 798, § 1 (reprinted in 2 McKinney's 1986 Session Laws of New York 1882). As the Practice Commentaries further point out, this amendment means that a question of law is now preserved "if the point was expressly decided by the trial court in response to a protest, even though the protesting party overlooked that point when articulating the protest." *Id.* at 11.

Here, as described above, the prosecution asked that Echevarria's out-of-court statements be admitted, and the defendant opposed this request—"a protest by a party." Then, after the parties litigated the *Sirois* hearing, the trial court made an oral and written ruling, in which it "expressly decided the question raised on appeal," whether defense counsel would be able to cross-examine Echevarria. Therefore, the question of law appears to have been preserved, even if the protesting party had "overlooked that point when articulating the protest." *Id.*[16] Even before the 1986

---

**16.** The Practice Commentaries further cite suppression hearings, analogous to the *Sirois*

amendment, it seems that the issue would have been preserved because the point was not overlooked, and defense counsel did make her "position with respect to the ruling ... known to the court." CPL § 470.05(2).[17]

Moreover, even if Cotto did not satisfy either of these two grounds for preservation, a third ground in § 470.05(2) was plainly met. Under § 470.05(2), "regardless of whether any actual protest thereto was registered," a party who "has either expressly *or impliedly* sought or requested a particular ruling or instruction, is deemed to have thereby protested the court's ultimate disposition of the matter." (emphasis added). Certainly, counsel's statement that it would be "really totally completely unfair" to "not allow me to cross-examine Mr. Echevarria on any or all of his background" constitutes an implied request to be allowed to cross-examine Echevarria.

Nonetheless, as respondent quite correctly points out, Cotto's noncompliance with CPL § 470.05 has already been decided as a matter of state law by New York's highest court. Our task is not to determine whether that ruling was correct, but to determine its adequacy to preclude federal habeas review. That is a federal question, and the Supreme Court's jurisprudence demands that we independently consider the degree to which § 470.05 was complied with to determine whether federal habeas review should be precluded.

After considering that question, we conclude that once a party has made his position known to the court, "the law does not require [him] to make repeated pointless protests" after the court has ruled. *People v. Mezon*, 80 N.Y.2d 155, 161, 589 N.Y.S.2d 838, 603 N.E.2d 943, 946 (1992). At a minimum, such a practice is not "firmly established and regularly followed" in the circumstances presented in this case. We therefore conclude that the New York Court of Appeals' application of the contemporaneous objection rule to this situation is inadequate to preclude federal habeas review of this claim.[18]

B. *The Merits*

Because the preclusion of cross-examination claim is not procedurally barred, we proceed to address the merits of this claim.

1. *The "Unreasonable Application" Standard*

■■■ Petitioner argues that the decision to preclude any cross-examination of Echevarria was an "unreasonable application" of clearly established Supreme Court precedent. Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413, 120 S.Ct. 1495.

---

hearing in this case, as a situation where a court sometimes makes "findings that include matters not specifically relied upon by the defendant," which are now considered preserved under CPL § 470.05 after the 1986 amendment. Practice Commentaries, at 11.

17. Indeed, requiring Cotto to make an additional objection after the ruling here arguably returns CPL § 470.05 to its pre–1946 status, when it was necessary to take an express "exception" to a ruling in order to raise an

error of law on appeal. *See* Practice Commentaries, at 10.

18. Petitioner also argues that counsel's failure to lodge an additional objection after the judge's ruling constituted ineffective assistance of counsel, constituting sufficient "cause" to excuse the procedural default. Because we conclude that the procedural default does not bar review of petitioner's claim, we need not reach this issue.

248

Although it is clear that the question is "whether the state court's application of clearly established federal law was objectively unreasonable," *Williams,* 529 U.S. at 409, 120 S.Ct. 1495, the precise method for distinguishing "objectively unreasonable" decisions from merely erroneous ones is less clear. *See, e.g., Francis S. v. Stone,* 221 F.3d 100, 111 (2d Cir.2000); *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001). However, it is well-established in our circuit that the "objectively unreasonable" standard of § 2254(d)(1) means that petitioner must identify "some increment of incorrectness beyond error" in order to obtain habeas relief. *See Fuller,* 273 F.3d at 219; *Francis S.,* 221 F.3d at 111.

■ Petitioner argues that the state courts unreasonably applied the forfeiture-by-misconduct doctrine—far beyond the admission of out-of-court statements—to permit the complete preclusion of cross-examination of a witness who actually testified at trial. For the reasons that follow, we agree with petitioner, and hold that the state court decision to preclude all cross-examination was an "objectively unreasonable" application of clearly established Supreme Court law.

The Appellate Division, the highest state court to consider the merits of the claim, ruled that "the court's ruling barring cross-examination of the witness was appropriate under the circumstances presented since the witness's testimony was at complete variance with his prior statement to the People." *Cotto,* 658 N.Y.S.2d at 279. In support of its conclusion, the Appellate Division cited to *People v. Geraci,* even though the witness did not testify in that case, and held that the scope of the waiver included the introduction of hearsay statements and a bar on cross-examination on "the substance of the out-of-court statements." 85 N.Y.2d at 366, 625 N.Y.S.2d 469, 649 N.E.2d 817. Nonetheless, we are

"determining the reasonableness of the state courts' 'decision,' 28 U.S.C. § 2254(d)(1), not grading their papers." *Cruz v. Miller,* 255 F.3d 77, 86 (2d Cir. 2001). As a result, "[a]lthough sound reasoning will enhance the likelihood that a state court's ruling will be determined to be a 'reasonable application' of Supreme Court law, deficient reasoning will not preclude AEDPA deference." *Id.* (citations omitted). To answer the question of the reasonableness of the Appellate Division's ultimate decision, we must turn to the intersection of "clearly established" Supreme Court law under two doctrines: the right of cross-examination, and the waiver of confrontation rights through misconduct.

### 2. *Clearly Established Supreme Court Law on Cross–Examination*

■ The right of cross-examination, though not absolute, is one of the most firmly established principles under Supreme Court law. "Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis,* 415 U.S. at 316, 94 S.Ct. 1105. In *Davis,* the Supreme Court held that the constitutional right to cross-examine a witness includes the opportunity to expose a witness's biases and possible motives to lie. The Court held that the defendant should have been allowed to cross-examine a prosecution witness about his relationship with law enforcement, which may have provided the witness with a motive to fabricate accusations against the defendant in order to obtain leniency. *Id.* at 316–18, 94 S.Ct. 1105. As the Court stated, "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316–17, 94 S.Ct. 1105. This principle has been reaffirmed by the

Supreme Court and our court ever since. *See, e.g., Delaware v. Van Arsdall,* 475 U.S. 673, 679, 106 S.Ct. 1431, .89 L.Ed.2d 674 (1986); *Fuller,* 273 F.3d at 219; *Henry v. Speckard,* 22 F.3d 1209, 1214 (2d Cir.), *cert. denied,* 513 U.S. 1029, 115 S.Ct. 606, 130 L.Ed.2d 517 (1994) ("The motivation of a witness in testifying, including her possible self-interest and any bias or prejudice against the defendant, is one of the principal subjects for cross-examination."); *cf. United States v. Maldonado–Rivera,* 922 F.2d 934, 955 (2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1026 (1991) ("The court should avoid any blanket prohibition on exploration of an area that is central to an assessment of the witness's reliability."). In addition to demonstrating bias, the defendant is entitled to use cross-examination to impeach the witness's recollection, ability to observe, and general credibility. *See, e.g., United States v. Reindeau,* 947 F.2d 32, 36 (2d Cir.1991); *Harper v. Kelly,* 916 F.2d 54, 57 (2d Cir.1990).

The Confrontation Clause is violated when a defendant is "prohibited from engaging in otherwise appropriate cross-examination designed ... 'to expose to the jury the facts from which jurors ... could appropriately draw inferences relating to the reliability of the witness.'" *Van Arsdall,* 475 U.S. at 680, 106 S.Ct. 1431 (quoting *Davis,* 415 U.S. at 318, 94 S.Ct. 1105). Most of the cases involving this type of Confrontation Clause violation involve a trial court limiting cross-examination into a particular subject, *see, e.g., Davis,* 415 U.S. at 316, 94 S.Ct. 1105; Mehler et al., FEDERAL CRIMINAL PRACTICE: A SECOND CIRCUIT HANDBOOK § 8–2, at 109 (Matthew Bender 2002) (collecting cases), where the question is whether "the jury is in posses-

sion of facts sufficient to make a 'discriminating appraisal' of the particular witness's credibility." *United States v. Roldan–Zapata,* 916 F.2d 795, 806 (2d Cir.1990), *cert. denied,* 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991) (quoting *United States v. Singh,* 628 F.2d 758, 763 (2d Cir.1980)).

The impingement on the confrontation right here, where defendant was completely precluded from cross-examining the only living person to identify Cotto as the shooter, is particularly stark. The Appellate Division's decision is not "objectively unreasonable" only if it was reasonable to conclude that the waiver of confrontation rights can extend even to the cross-examination of a prosecution witness who actually takes the stand and testifies.

### 3. *Clearly Established Supreme Court Law on Waiver of Cross–Examination Through Misconduct*

The Supreme Court has considered only one case involving a waiver through misconduct of the right to cross-examine. *See Reynolds v. United States,* 98 U.S. 145, 159, 25 L.Ed. 244 (1878); Kroger, *supra,* at 846 ("Despite a sharp split between the circuits on the manner in which courts should apply the rule, the Supreme Court has repeatedly declined to hear contemporary confrontation waiver cases.") (footnotes omitted).[19] Since *Reynolds,* the Court has decided only two other cases involving a waiver of the right to cross-examine, and neither involved misconduct. *See Brookhart v. Janis,* 384 U.S. 1, 5, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966) (petitioner did not "intelligently and knowingly" waive his right to cross-examine witnesses, despite his counsel's representations); *Diaz v. United States,* 223 U.S. 442, 452–53, 32 S.Ct. 250, 56 L.Ed. 500 (1912) (de-

---

19. Indeed, the trial court recognized that *Reynolds* was the Supreme Court case that governed: "I am following what I believe to

be the line of cases emanating from *Reynolds v. United States* in 1878 and continuing through *Geraci* ...."

fendant waived Confrontation Clause objections to introduction of prior testimony because his own lawyer introduced the prior testimony about which he complained on appeal).

■ *Reynolds* remains the governing Supreme Court case on waiver of the right to cross-examine a witness through misconduct, although this doctrine has been more fully developed in the federal courts of appeals. In *Reynolds*, after a finding that the defendant had procured the witness's unavailability, the Court upheld, over a Confrontation Clause challenge, the admission of prior witness testimony from a trial of the same defendant on the same charge. The Court relied in large part upon the fact that "the accused was present at the time the testimony was given, and had full opportunity of cross-examination." 98 U.S. at 161. As a result, the Court concluded, "[t]his brings the case clearly within the well-established rules." *Id.* (citing 1 *Wharton on Evidence* § 177). Because this witness did not testify at the second trial, cross-examination of a testifying witness was not at issue. Although the courts of appeals, including our court, have since expanded the types of testimony which will be admitted, *see, e.g., Aguiar,* 975 F.2d at 47, the holding of *Reynolds* itself is narrow. And "clearly established Federal law" under § 2254(d)(1) refers to the "holdings, as opposed to the dicta" of the Supreme Court's decisions. *Williams,* 529 U.S. at 412, 120 S.Ct. 1495.

■ The Supreme Court has never dealt with this precise question of the scope of a waiver of the right to cross-examine a witness because of misconduct, when the witness actually takes the stand at trial. Although our task is "to determine whether the state courts reasonably applied clearly established Supreme Court law, we think it appropriate to make some examination of how the federal courts of appeals have analyzed the issue." *Cruz v. Miller,* 255 F.3d 77, 85 (2d Cir.2001). Like the Supreme Court, no federal court of appeals has faced the waiver issue in this particular situation: where the witness actually takes the stand at trial. The trial court reached its conclusion based on our decision in *U.S. v. Aguiar,* 975 F.2d 45 (2d Cir.1992), concluding that the scope of waiver was broader under the law of our circuit than under New York state law. *See Cotto,* 642 N.Y.S.2d at 796 (citing *Aguiar,* 975 F.2d at 47). We agree with petitioner that the trial court, and implicitly the Appellate Division, improperly read *Aguiar* as precluding cross-examination in these circumstances.

In *Aguiar,* the prosecution had proven in a hearing, like the *Sirois* hearing in this case, that the defendant had intimidated a prosecution witness into not testifying at trial. *See Aguiar,* 975 F.2d at 47. Nonetheless, defendant challenged the admission of the witness's statements to law enforcement officers on the ground that only sworn testimony, such as testimony before a grand jury, could be admissible under the Confrontation Clause, even if the defendant had forfeited his confrontation right through misconduct. *Id.* We rejected this contention, holding that forfeiture of confrontation rights extended "for all purposes," referring to both sworn and unsworn statements. *Id.* Because the witness in that case never took the stand, the issue of preclusion of cross-examination of an actual prosecution witness at trial was not before the *Aguiar* court. To the extent that *Aguiar* can be read more broadly, it must be considered dicta.[20]

---

**20.** We have not hesitated to describe our prior statements as dicta when they were not necessary to the holdings of the decisions in which they were made. *See, e.g., United*

### 4. *Objective Unreasonableness*

Several factors lead us to conclude that the Appellate Division's determination that the preclusion of cross-examination was proper was objectively unreasonable. First, there is the lack of any precedent supporting this result in the Supreme Court or any federal court of appeals. Petitioner argues that the result in this case, where a defendant is completely precluded from cross-examining a prosecution witness who takes the stand, is "unprecedented in more than 200 years of American jurisprudence." Though we are not as confident in our command of the nation's legal history as petitioner's counsel, respondent has pointed to no other case—and our research reveals none—in which this occurred. More specifically, we find no other cases where the jury was presented with direct, in-person testimony from the witness, and the witness's prior out-of-court statements, but no cross-examination whatsoever was permitted. In contrast, in *Williams v. Taylor,* the case where the Supreme Court first defined "unreasonable application" standard under AEDPA, several federal courts of appeals, as well as many state courts, had applied the law in the same way as Virginia's highest court had in that case. *See* 2 Liebman and Hertz § 32.3, at 1449 & n. 47 (citing Respondent's Brief in *Williams v. Taylor,* which in turn cited opinions from eight federal circuits). Nonetheless, the Supreme Court still found the decision of the Virginia Supreme Court objectively unreasonable. 529 U.S. at 397, 120 S.Ct. 1495.

Certainly, one could argue that the lack of any Supreme Court precedent directly on point supports the conclusion that the state court determination was not unreasonable. *See, e.g., Hines v. Miller,* 318 F.3d 157, 163 (2d Cir.2003) (relying in part on the "absence of any Supreme Court

decision concerning this type of claim" in holding that the Appellate Division's decision was not unreasonable). We have also said, however, that "the lack of Supreme Court precedent" addressing forfeiture of a particular constitutional right does not mean that "any determination that such a fundamental right has been forfeited ... would survive habeas review." *Gilchrist v. O'Keefe,* 260 F.3d 87, 97 (2d Cir.2001). Moreover, in *Hines,* we also relied on "the many divergent approaches and outcomes in federal courts that have applied clearly established Supreme Court precedent to the facts at issue"—a factor that was also present with respect to the first issue certified on appeal here, *see supra,* but is not present with respect to the preclusion of cross-examination. 318 F.3d at 163. Indeed, in this case, the reasonableness of the state courts' determination of the scope of the waiver must be evaluated in light of the countervailing, clearly established right to cross-examine for bias. *Cf. Jones v. Stinson,* 229 F.3d 112, 119–20 (2d Cir.2000) (although the Supreme Court had not "decided the specific circumstances under which a criminal defendant must be allowed to introduce evidence of prior non-criminal conduct," court evaluated whether decision "was objectively unreasonable in light of Supreme Court precedent that the opportunity to present a defense is one of the constitutional requirements of a fair trial").

Second, we are influenced by the lack of any specific reasons for extending the ban on cross-examination this far. Both the Appellate Division, in citing *Geraci,* and the trial court, in citing our opinion in *Aguiar,* seemed to believe that the automatic consequence of a finding that the defendant had procured the witness's unavailability was a complete preclusion of

cross-examination. While there might be a circumstance where a complete preclusion of cross-examination could be justified, this would be exceedingly rare. For example, there could be a witness who took the stand who was so thoroughly intimidated by the defendant that she refused to answer any questions at all, despite entreaties from the trial court. Certainly, nothing in this record indicates that this case presented such a circumstance, however, and neither the Appellate Division nor the trial court presented any reasons why this case might fall into such a rare category.

Finally, the preclusion of cross-examination is inconsistent with the purpose behind the forfeiture-by-misconduct rule. As articulated by the Supreme Court, "[t]he rule has its foundation in the maxim that no one shall be permitted to take advantage of his own wrong." *Reynolds*, 98 U.S. at 159. In allowing Echevarria's prior statements to be presented to the jury, we ensure that the jury has the benefit of statements which may assist in its truth-seeking function, statements which the jury ostensibly would have heard directly from the witness were it not for the defendant's misconduct. The rule is a remedial one designed to protect the truth-seeking process.

Cross-examination serves the same purpose: helping the jury determine the truth. "The right to cross-examination ... is essentially a 'functional' right designed to promote reliability in the truth-finding functions of a criminal trial." *Kentucky v. Stincer*, 482 U.S. 730, 737, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987). Indeed, the Supreme Court has emphasized that cross-examination is the "greatest legal engine ever invented for the discovery of truth." *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (quoting Wigmore on Evidence). One of the jury's central tasks in this trial was to determine whether Echevarria told the truth when he said that he saw Cotto shoot Davilla. To deprive the jury of the powerful tool of cross-examination, when the witness was literally available, harmed the truth-seeking process as much as it did Cotto.

In sum, the above factors—(1) the absence of any Supreme Court holdings extending the forfeiture of confrontation rights to complete preclusion of cross-examination of a prosecution witness who actually testifies at trial, juxtaposed against the clearly established right to cross-examine adverse witnesses for bias and motive to lie; (2) the lack of any reasons why a complete ban was necessary and appropriate in this case; and (3) the centrality of cross-examination to the truth-seeking process—lead us to conclude that the state court determination to preclude cross-examination of Echevarria entirely was an "objectively unreasonable" application of clearly established Supreme Court law.

Because we conclude that the state courts' determination that the complete preclusion of cross-examination did not violate petitioner's Sixth Amendment rights was an "unreasonable application" of clearly established Supreme Court law, we necessarily would reach the same result under a *de novo* standard. We therefore need not decide whether the claim was actually "adjudicated on the merits" within the meaning of § 2254(d). As in previous cases, "[w]e need not and do not resolve today the question of whether § 2254(d)'s standard of review applies because nothing turns on it here." *Washington v. Schriver*, 255 F.3d 45, 55 (2d Cir.2001); *see also Cohen v. Senkowski*, 290 F.3d 485, 488 (2d Cir.2002); *Leka v. Portuondo*, 257 F.3d 89, 97–98 (2d Cir.2001) ("We need not decide what level of deference to accord those

rulings, because even under AEDPA's deferential standard of review, the rejection of Leka's claim ... was unreasonable.").

For the reasons stated, the decision to preclude any cross-examination of Echevarria was objectively unreasonable, and violated Cotto's constitutional right of confrontation.

### 5. *Harmless Error*[21]

#### a. *Standard of Review*

 A violation of a defendant's confrontation rights does not, standing alone, require reversal of a judgment of conviction. Rather, violations of the Confrontation Clause are subject to harmless error analysis. *See Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431; *see also Henry,* 22 F.3d at 1215. In a case like this one, where a reviewing court concludes that the trial judge has improperly curtailed cross-examination, the inquiry is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless ...." *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431. "The burden of persuasion is on the government, meaning that if 'the matter is so evenly balanced that [the federal judge] feels himself in virtual equipoise as to the harmlessness of the error,' the petitioner should prevail." *Lainfiesta v. Artuz,* 253 F.3d 151, 158 (2d Cir.2001) (quoting *O'Neal v. McAninch,* 513 U.S. 432, 435, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995)), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1611, 152 L.Ed.2d 625 (2002).

In *Van Arsdall,* a case which reached the Supreme Court on direct appeal from the state courts, the Court applied the harmless error standard set out in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), where a conviction infected by constitutional error must be overturned unless a reviewing court can say that the error was "harmless beyond a reasonable doubt." *Id.* at 24, 87 S.Ct. 824. Petitioner argues that that the *Chapman* standard should apply in this case as well, although for cases on collateral review, an error is generally considered harmless if it did not have a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). In this case, harmless error was never reached in the state courts, and there is therefore no state ruling which commands AEDPA deference.

In *Santana–Madera v. U.S.,* 260 F.3d 133, 140 (2d Cir.2001), we noted that "[n]either the Supreme Court nor this Court has definitively established a proper harmless error standard to apply when a constitutional error is being evaluated [for harmlessness] for the first time on collateral review."[22] In that case, we noted differences among the circuits on this issue, but concluded that the case did not "require us to settle the question." *Id.* Similarly, we need not decide the issue

---

**21.** In its principal brief, respondent did not argue in the alternative that any constitutional error was harmless. Nonetheless, in an abundance of caution, the panel requested and received supplemental briefing on the "harmless error" question.

**22.** *Drake v. Portuondo,* 321 F.3d 338, 347 & n. 4 (2d Cir.2003), does not hold to the contrary.

Our reference in that case to *Brecht* indicated that if the prosecutor knew or should have known of the perjury, *Brecht*'s harmless error standard would be satisfied. Because the choice of the correct standard was therefore not outcome-determinative in *Drake,* we did not need to resolve the issue.

here because, even under the *Brecht* standard, the error cannot be called harmless.

b. *Application of* Van Arsdall *Factors*

In *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986), the Supreme Court outlined a series of factors to consider when a Confrontation Clause violation should be considered harmless error: "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and ... the overall strength of the prosecution's case." We assess each of these factors in order to determine whether the preclusion of cross-examination of Echevarria was harmless error.

The first factor—the importance of Echevarria's testimony in the prosecution's case—weighs in favor of petitioner. Although Echevarria's incriminating statements came in as prior out-of-court statements through the testimony of the police officers, they were extremely important because Echevarria was the only witness to identify Cotto as the shooter. The significance of Echevarria's prior statements is demonstrated by the prosecution's reliance on them in its summation to the jury:

> You know, he's in my office, Anthony Echevarria ... It's a secured place and he's comfortable enough that he says, hey look, I know who did it. It was Richie Cotto. Richie Cotto did this crime. He says it. Then he comes into the courtroom, right. And he takes the stand he takes a oath. Now, it's a different ballgame again. The defendant is here, he's confronted by the defendant

.... [T]hese are different rules. It's different in here.

In closing, the prosecution again emphasized Echevarria's identification: "The fact that the deceased [Davilla] says it was Richard Cotto who did it, I submit there's no dispute. The fact that Anthony Echevarria says that it is Richie Cotto who does the shooting, I submit there is no dispute."

Echevarria's trial testimony and out-of-court statements were not cumulative—the second *Van Arsdall* factor—as he was the only person besides Davilla to identify Cotto as the shooter. Similarly, looking at the third factor, the degree of corroborating or contradictory evidence on material points of the witness's testimony, the victim's apparent identification of Cotto in the ambulance does corroborate Echevarria's statements to the prosecutor and police. However, Echevarria's trial testimony, and statements shortly after the shooting, are contradictory evidence, as well as (arguably) Officer Anderson's acknowledgment that he saw another man arguing with Davilla shortly before the shooting.[23] Moreover, because the preclusion of cross-examination was complete, the fourth *Van Arsdall* factor—the extent of cross-examination otherwise permitted—weighs heavily in favor of the petitioner and highlights the unusual nature of this case.

The final factor to consider—the overall strength of the prosecution's case—also weighs in petitioner's favor, as the case against Cotto was less than overwhelming. Respondent argues that there is "no possibility" that Cotto would have been acquitted, even if Echevarria's testimony had been completely discounted by the jury, because of the victim's identification of Cotto as the shooter in the ambulance, as recounted to the jury by Officer Anderson

---

**23.** Witnesses described two men running from the park after the shooting.

and corroborated by the emergency medical technician who was in the ambulance. According to the officer, Davilla even provided details such as the apartment where Cotto lived and the kind of car that he drove. But the defense raised questions throughout the trial about the reliability of this identification, suggesting that both Davilla and Officer Anderson, each with a history of disputes with Cotto, had a motive to point the finger at the defendant. And the absence of further corroborating evidence might well have led the jury to conclude that the prosecution had not met its burden.[24] It appears there was no ballistics or other physical evidence linking Cotto to the murder, and the prosecution's case rested primarily on the hearsay statements of Davilla and Echevarria.

Most importantly, the lack of cross-examination deprived the defendant of the opportunity to highlight and emphasize to the jury Echevarria's potential bias—that Echevarria made the statements when he was incarcerated on an unrelated charge and therefore had a motive to curry favor with law enforcement in return for leniency in his upcoming parole hearing. Given Echevarria's two prior statements to the police shortly after Davilla's shooting, in which he said that he could not identify the shooter, and Echevarria's belated identification of Cotto, such cross-examination

may well have influenced the jury's assessment of Echevarria's credibility.

Respondent argues that the jury already had sufficient evidence to evaluate Echevarria's credibility. Indeed, arguably Echevarria's direct testimony, where he discussed his prior criminal record and said that he could not identify the shooter, was more than sufficient to raise serious doubts in the minds of the jury about Echevarria's credibility and the reliability of his prior statements. In defense counsel's summation, she was able to tell the jury: "Testifying under oath he told you that he never looked at the shooter and that he 'went for cover.' Of course, you also heard what he said in the DA's office last week to Police Officers Vargas and Detective Quinones and it's going to be up to you to decide whether this uncorroborated hearsay, in the District Attorney's office, in the face of 6 or 7 law-enforcement officials in a 10 by 10 office can probably or possibly be the truth." Moreover, defense counsel was able to attack Echevarria's credibility in summation by invoking his criminal history, brought out on direct examination.[25] Certainly, the circumstances are unusual in this case, because cross-examination would be targeted at impeaching Echevarria's prior statements

---

24. The prosecution also offered the following evidence as consciousness of guilt: (1) the fact that Cotto could not be found for several months after the shooting; (2) Echevarria's statement, as conveyed by the police officers, that Cotto pointed a gun at him after leaving the scene of the shooting; and (3) Cotto's use of a false name at the time of his arrest.

25. Specifically, defense counsel said: "[Y]ou're being asked ultimately to convict Richard Cotto based upon three eyewitnesses who never named him to you as the shooter. Or upon two cops repeating an unsworn statement never written down, said in front of overwhelming law enforcement presence

three and half years after the incident by a drug dealer, robber, absconder, someone who casually tells you how he robbed by telling someone he'd blast them on the spot." (referring to Echevarria).

The prosecution responded: "Now, defense counsel brought out in her summation about the fact that Echevarria was cavalier about his record and then she mentioned about Steven Davilla and his record. Now, if you recall you folks made a promise to me during jury selection and that promise you made to me that you would not totally disregard a person's testimony totally on the fact that this person was convicted of a crime."

rather than the trial testimony.[26] But the harmlessness inquiry is focused on the effect on the jury if "the damaging potential of the cross-examination were fully realized." *Van Arsdall,* 475 U.S. at 684, 106 S.Ct. 1431.

On this point, we find Judge Smith's dissent in the Court of Appeals particularly persuasive, and adopt his reasoning:

> Several reasons underscore the importance of cross-examination in this case. First, Echevarria was the only living witness against the defendant. The defendant's freedom rested upon the strength and weakness of this sole witness's testimony. The removal of defendant's right to confront this sole witness against him was a fatal blow to defendant's case. Second, a cross-examination of the witness could have brought forth the fact that the witness had a motive to support the People's view of the evidence. According to defense counsel, cross-examination as to the timing of Echevarria's statements inculpating the defendant would have revealed that these statements were made only during a period when Echevarria had a motive to fabricate. Specifically, the statements were made while there existed the possibility that cooperation with the People would speed his release from

prison. Additionally, defense counsel argued that cross-examination could have revealed that the sole witness against the defendant was less than forthcoming on the stand in describing his prior offenses, and that in the witness's initial discussions with the police investigators, he did not name the defendant as the shooter.

92 N.Y.2d at 84, 677 N.Y.S.2d 35, 699 N.E.2d 394. As Cotto put it in his briefs to both the Appellate Division and the Court of Appeals, "the defendant's position is clear as to the cause of Echevarria's allegations: He was hoping to get out of jail early."[27]

But the jury never heard the following, relevant to Echevarria's potential bias and overall credibility: (1) at the time of his testimony, Echevarria resided in prison on Riker's Island, although it did come out during cross-examination that he was in the custody of the Department of Corrections at the time of the out-of-court statements; (2) that he was scheduled to go before the Parole Board in a matter of days, and might therefore have a motive to curry favor with law enforcement; (3) that he had given two prior statements to the police, one of which was written, immediately after the shooting, saying that he did

26. Respondent also argues that Cotto had good reason to forego any cross-examination of Echevarria, even if the court permitted it, because his direct testimony was beneficial to the defense. This may well be true, but in the absence of forfeiture of the right to cross-examine Echevarria, we do not find this argument particularly relevant.

27. In his brief to the Court of Appeals, petitioner further explained: "We believe that cross-examination as to the timing of Echevarria's statements inculpating the defendant would have revealed that they were made only during a period when Echevarria had a motive to fabricate, that was, while there existed the possibility that it would get him out of prison early. Moreover, we believe that

cross-examination would have revealed, *inter alia,* that Echevarria lied or failed to be forthcoming on the stand in describing his prior offenses, that he lied in a written confession to police in describing his robbery offense, that according to [a] criminal complaint filed against him, he apparently robbed the same person twice on two separate occasions although it appears the second robbery occurred after his effort—according to his claims—to return some of the money he had stolen earlier, and would have revealed a pattern of bench warranting which, in addition to his absconding from work release, reflected a greater than usual loathing for being in prison."

not see the shooter;[28] (4) that he did not identify Cotto as the shooter until more than three years after the shooting took place; and (5) that Echevarria failed to be forthcoming on the stand in describing his prior offenses. All of these were fair topics for cross-examination, and might well have influenced the jury's assessment of Echevarria's credibility.

In short, we find petitioner's argument persuasive that application of the *Van Arsdall* factors militate in favor of granting the writ. In these circumstances, we find it difficult to conclude that the error did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos,* 328 U.S. at 776, 66 S.Ct. 1239). Echevarria was the only living person to say that he saw Cotto commit this murder. Cross-examination of Echevarria could well have significantly undermined his credibility, causing the jury to disbelieve, or at least seriously doubt, his prior statements identifying Cotto as the shooter—statements which contradicted both Echevarria's initial statements to the police, immediately after the shooting, as well as his actual trial testimony. And without Echevarria's testimony linking Cotto to the murder, the jury may well have concluded that the prosecution had not proven Cotto's guilt beyond a reasonable doubt.

The trial court's charge to the jury highlighted, on two separate occasions, the importance of considering Echevarria's testimony with an eye toward his possible motives to lie.[29] But the jury was not "in possession of facts sufficient to make a 'discriminating appraisal' " of Echevarria's credibility. *Roldan–Zapata,* 916 F.2d at 806. They simply did not have the information needed to properly evaluate Echevarria's motives and accordingly give his statements the weight they thought the statements deserved. This not only violated defendant's constitutional rights, but it undermined the fact-finding and truth-seeking function of the trial. Given the well-established principle of the importance of cross-examination in jurors' as-

---

**28.** Officer Vargas did testify that during the previous week's interviews, the prosecutor showed Echevarria "a piece of paper" and asked "Do you remember this? Did you write this?" When Echevarria acknowledged writing it, the prosecutor asked, according to Vargas: "Why didn't you write the name of the person who did it?" and Echevarria replied " 'Cause I was scared." But defense counsel did not pursue this topic on cross-examination of Vargas.

**29.** First, the trial court instructed:

[B]ecause Mr. Echevarria testified during his appearance before you that he did not see who shot Mr. Davilla and because he was, therefore, not subject to cross examination by the Defense regarding his contradictory statements allegedly made to the police earlier in the week, it is your duty to examine the out-of-court statements reported by Officer Vargas and Detective Quinones with special care and caution, and without speculating as to what Mr. Echevarria would have said on cross-examination .... Ask yourselves whether Mr. Echevarria was accurately reporting the facts when he spoke to the police witnesses on March 13th and March 14th, or whether he was accurately reporting what he saw when he testified before you on March 18th. In that connection, you should consider whether on a particular occasion under consideration there was any reason for him to have been untruthful.

Later, the court instructed: "You must consider and evaluate the credibility of Steven Davilla and Anthony Echevarria from all of the facts as you know them, and decide whether such statements as you find them to have been made, if any, were truthful and accurate .... Consider not only whether they had the capacity to remember and accurately report the identity of the gunman at the time in question, but also whether either Davilla or Echevarria had any motive or reason to be untruthful in their out-of-court statements."

sessment of the witness credibility, and the centrality of Echevarria to the prosecution's case, it would simply stretch the meaning of the word "harmless" too far to conclude that the complete lack of cross-examination did not affect the jury's verdict. Accordingly, this conviction cannot stand.

## IV. Conclusion

We reverse the judgment of the District Court and remand for the entry of judgment conditionally granting the writ and ordering Cotto's release unless the State provides him a new trial within ninety days. The mandate will issue forthwith.